O

# Death Penalty

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JESSE EDWARD GONZALEZ, | ) | CASE NO. CV 95-2345 JVS |
| | ) | |
| Petitioner, | ) | DEATH PENALTY CASE |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| ROBERT L. AYERS, JR., | ) | DENYING PETITIONER'S |
| Warden of California State | ) | |
| Prison at San Quentin, | ) | REMAINING CLAIMS |
| | ) | |
| Respondent. | ) | [Claims A(1)(e), A(2)(b), |
| | ) | A(2)(c), A(3)(a), A(3)(b), |
| | | A(3)(c), B(2)(a), B(2)(b), |
| | | B(2)(c), B(2)(d),B(2)(e), |
| | | B(3)(a), B(3)(b), and |
| | | B(3)(c)] |

**PROCEEDINGS**

Petitioner, a California state prisoner under sentence of death, initiated this federal habeas corpus action on April 12, 1995, when he requested a stay of execution and appointment of counsel. (Request for Appointment of Counsel and for Stay of Execution of Death Sentence, filed Apr. 12, 1995). He filed the original Petition for Writ of Habeas Corpus on September 20, 1996 and the operative Corrected

1

1   Petition for Writ of Habeas Corpus on October 17, 1996.[1]

2   (Petition for Writ of Habeas Corpus, filed Sept. 20, 1996;

3   Petition for Writ of Habeas Corpus (Corrected), filed Oct.

4   17, 1996 ("Crctd. Pet."); see also Memorandum of Points and

5   Authorities in Support of Petition for Writ of Habeas Corpus

6   (Corrected), filed Sept. 25, 1996 ("Crctd. Ps&As")).

7

8       After filing the operative petition, petitioner moved

9   for an evidentiary hearing.  (Notice of Motion and Motion

10   for Evidentiary Hearing, filed Jan. 8, 1999).  On October 5,

11   1999, the Court denied in part petitioner's request for an

12   evidentiary hearing and deferred rulings on several claims

13   involving the prosecution's jailhouse informant witness,

14   William Acker.  (Order on Petitioner's Motion for

15   Evidentiary Hearing, filed Oct. 5, 1999 (hereafter, "Evid.

16

---

17   [1]   The Corrected Petition alleges petitioner's claims in
18   extremely conclusory fashion.  Were the Court to limit its
     consideration to the four corners of the Corrected Petition,
19   the Court would dismiss the all of petitioner's claims for
     lack of specificity.  See James v. Borg, 24 F.3d 20, 26
20   (9th Cir.) ( "Conclusory allegations [of ineffective
     assistance of counsel] which are not supported by a
21   statement of specific facts do not warrant habeas relief."),
     cert. denied sub nom. James v. White, 513 U.S. 935 (1994);
22   Campbell v. Wood, 18 F.3d 662, 679 (9th Cir.) (conclusory
     allegations are insufficient to justify an evidentiary
23   hearing), reh. and reh. en banc denied, 20 F.3d 1050 (9th
     Cir.), cert. denied, 511 U.S. 1119 (1994); 1 R. Hertz, J.
24   Liebman, Federal Habeas Corpus Practice & Procedure, § 11.6,
     at 572-77 (4th ed. 2001) (laying out the requirements for
25   pleading facts in habeas petitions).  However, petitioner
     filed memoranda of points and authorities which lend
26   specificity to his claims.  (Crctd. Ps&As, supra; Memorandum
     of Points and Authorities in Support of Petition for Writ of
27   Habeas Corpus, filed Sept. 20, 1996).  The Court
     incorporates the specific allegations of these memoranda
28   into the corrected petition.

2

H. Ord.")).  Specifically, the Court denied an evidentiary hearing on four claims on the basis that the claims were without merit.  (Evid. H. Ord., at 7-12 (Claim A(1)(a) (Ineffective assistance of trial counsel based on trial counsel's failure to investigate and present witnesses and evidence)), 16-19 (Claim A(1)(c) (IAC based on trial counsel's failure to investigate and present evidence of petitioner's impaired mental state)), 26-27 (Claims A(1)(d) and A(2)(a) (IAC based on trial counsel's failure to investigate and present, and a claim under Brady v. Maryland, 373 U.S. 83 (1963), based on the prosecution's failure to disclose, impeachment evidence related to Acker)), 32-33 (Claim C(1) (the California Supreme Court's denial of discovery and an evidentiary hearing violated due process)).  The Court denied a hearing on four claims on the basis that it could decide the claims based on the record.  (Evid. H. Ord., at 12-13 (Claim A(1)(b) (IAC based on trial counsel's failure to investigate and present character evidence)), 19-20 (Claim A(1)(f) (IAC based on trial counsel's failure to request a jury instruction on the unreliability of informant testimony)), 27-30 (Claim A(3)(a) (the trial court violated due process when it "removed from the jury's consideration the determination of an element of the special circumstance allegation that the victim was a peace officer killed in the performance of his duties")), 30-32 (Claim B(1)(b) (penalty phase IAC based on trial counsel's failure to "investigate the law relating to the sole mitigating factor presented as a defense and explain

such factor to the jury.")).  The court deferred ruling on
two claims pending discovery.  (Evid. H. Ord., at 19 (Claim
A(1)(e) (IAC based on trial counsel's failure to investigate
and present evidence Acker was a government agent)), 27
(Claim A(2)(b) (prosecution's knowing use of false testimony
by Acker)).  Petitioner did not seek an evidentiary hearing
on: Claim A(2)(c), the prosecution "misstated the law during
argument to the jury" (Crctd. Pet., at 9), Claim A(3)(b),
the trial judge instructed the jury on the special
circumstance "under an overbroad standard" (Crctd. Pet., at
9), Claim A(3)(c), the trial court failed to give a specific
cautionary instruction on Acker's testimony (Crctd. Pet., at
10), Claim B(1)(a), petitioner's trial attorney was
ineffective in the penalty phase when he "failed to
adequately investigate and present mitigating background and
character evidence relating to [p]etitioner" (Crctd. Pet.,
at 10), Claims B(2)(a)-(e), for prosecutorial misconduct in
the penalty phase (Crctd. Pet., at 10-12), and Claims
B(3)(a)-(c), for erroneous jury instructions and admission
of photographs in the penalty phase.  (Crctd. Pet., at 12).

    On July 24, 2000, respondent moved for judgment on the
pleadings on five claims: Claim A(1)(b) (IAC: trial
counsel's failure to investigate and present character
evidence), Claim A(1)(f) (IAC: failure to request a jury
instruction on the unreliability of informant testimony),
Claim A(3)(a) (the trial court violated due process when it
removed the "peace officer killed in the performance of his

duties" element of the special circumstance from the jury's determination), Claim B(1)(a) (IAC: trial counsel failed adequately to investigate and present mitigating background and character evidence at the penalty phase), and Claim B(1)(b) (penalty phase IAC: trial counsel failed to "investigate the law relating to the sole mitigating factor presented as a defense and explain such factor to the jury."). (Motion for Judgement on the Pleadings as to Claims A(1)(b), A(1)(f), A(3)(a), B(1)(a) and B(1)(b), filed Aug. 7, 2000). On September 26, 2001, the Court granted summary adjudication to respondent on Claims A(1)(b), A(1)(f), A(3)(a), B(1)(a), and B(1)(b), "except for that portion of Claim A(3)(a) which alleges that the jury instruction on the validity of the search warrant on petitioner's parents' house violated petitioner's due process rights." (Memorandum and Order Granting and Denying Summary Adjudication of Claims, filed Sept. 25, 2001, at 38). The Court denied summary adjudication on this portion of Claim A(3)(a) and ordered additional briefing on this issue and Claims A(1 )(e), A(2)(b), A(2)(c), A(3)(b), A(3)(c), B(2)(a), B(2)(c), B(2)(d), B(2)(e), B(3)(a), B(3)(b), and B(3)(c). (Id., at 38-39; Minute Order dated Nov. 9, 2001; Minute Order dated Nov. 30, 2001).

On February 5, 2003, the Court issued a tentative ruling denying Claim A(3)(a) on the merits and, on February 6, 2003, heard oral argument on the claim. (See [Tentative] Memorandum and Order Granting Summary Adjudication of Claim

1    A(3)(a) to Respondent, served Feb. 5, 2003).  The Court has

2    not issued a final ruling on Claim A(3)(a).

3

4        On June 18, 2003, the Court, on reconsideration in

5    light of <u>Woodford v. Garceau</u>, 538 U.S. 202 (2003), of its

6    prior ruling to the contrary, held that the Antiterrorism

7    and Effective Death Penalty Act ("AEDPA") applies to this

8    case.  (Ruling on Respondent's Motion for Reconsideration of

9    Application of AEDPA to the Petition, filed Jun. 18, 2003;

10   <u>see</u> Evid. H. Ord., <u>supra</u>, at 4-5 (ruling pre-<u>Garceau</u>, that

11   AEDPA did not apply to this case)).

12

13       After discovery, petitioner moved for reconsideration

14   of that part of the Court's October 5, 1999 Order which

15   denied Claim A(2)(a), petitioner's <u>Brady</u> claim based on the

16   prosecution's failure to disclose evidence impeaching

17   prosecution witness William Acker.  (Notice of Motion and

18   Motion for Reconsideration, filed Jun. 5, 2003).  The Court

19   denied this motion on September 19, 2003.  (Order on

20   Respondent's [sic: Petitioner's] Motion for Reconsideration

21   of October 5, 1999 Order, filed Sept. 19, 2003).

22

23       Meanwhile, the parties briefed the remaining claims.

24   The Court ordered the parties to provide supplemental

25   briefing on claim A(3)(a), petitioner's <u>Bouie</u>[2] claim and the

26

27   [2]   <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 353-54 (1964)
     ("an unforeseeable judicial enlargement of a criminal
28   statute, applied retroactively," violates due process).

6

related issue of whether the search warrant Deputy Williams
was executing when he was shot was defective. (Minute
Order, dated Nov. 9, 2001, at 1-2). The Court ordered the
parties to propose a schedule for briefing the remaining
undecided claims. (Id., at 2).

Acting pursuant to this order, petitioner filed his
opening brief on the defective warrant issue on January 9,
2002. (Petitioner's Brief, re Defective Warrant, filed Jan.
9, 2002). Respondent filed a brief on the defective warrant
issue on March 15, 2002. (Respondent's Supplements Brief re
Allegedly Defective Search Warrant, filed Mar. 15, 2002).
Petitioner replied on this issue on April 15, 2002.
(Petitioner's Reply to Respondent's Supplements Brief re
Allegedly Defective Search Warrant, filed Apr. 15, 2002).
On January 14, 2002, respondent filed an opening brief on
petitioner's Bouie claim. (Respondent's Opening Brief re
Claim A(3)(a), filed Jan. 14, 2002). Petitioner filed his
brief on this claim on March 15, 2002. (Petitioner's
Opposition Brief re Claim A(3)(a), filed Mar. 15, 2002).
Respondent replied April 15, 2002. (Respondent's Reply
Brief re Claim A(3)(a), filed Apr. 15, 2002).

The Court adopted the briefing schedule the parties
submitted in response to the Court's November 9, 2001 minute
order. (Minute Order, dated Nov. 30, 2001; Joint Status
Report re Joint Proposed Briefing Schedule for Summary
Resolution of Outstanding Claims, filed Nov. 28, 2001).

7

Pursuant to that schedule, respondent filed an opening brief addressing claims A(1)(e), A(2)(b), A(2)(c), A(3)(b), A(3)(c), B(2)(a), B(2)(b), B(2)(c), B(2)(d), B(2)(e), B(3)(a), B(3)(b), and B(3)(c) ("the remaining claims"), on March 15, 2002. (Respondent's Supplemental Brief in Response to Court's Order of November 9, 2001, filed Mar. 15, 2002). Petitioner filed his responsive brief on May 16, 2002. (Petitioner's Opposition to Respondent's Supplemental Brief in Response to Court's Order of November 9, 2001, filed May 16, 2002 ("Ptr's. May 16, 2002 Opp.")). On June 17, 2002, respondent filed a reply brief on the remaining claims.[3] (Respondent's Reply Brief Regarding Claims A(2)(c), <u>etc</u>., filed Jun. 17, 2002). Petitioner filed a sur-reply on July 15, 2002. (Petitioner's Sur-Reply to Respondent's Reply Brief of June 17, 2002 Regarding Claims A(2)(c), <u>etc</u>., filed Jul. 15, 2002).

On March 16, 2005, the case was transferred to Hon. James V. Selna, and, on April 27, 2005, Judge Selna ordered

---

[3]    The Court's October 5, 1999 order on petitioner's request for an evidentiary hearing deferred rulings on claims A(1)(e) and A(2)(b), and, initially, the Court ordered, and the parties included, briefing on these claims in their supplemental briefing on the remaining claims. However, in his first motion for reconsideration of the Court's October 5, 1999 order, petitioner stated that discovery had turned up no new evidence regarding these claims, and the parties discontinued further briefing on them. (<u>See</u> Notice of motion and Motion for Reconsideration, filed Jun. 5, 2003, at 7 n.7; Respondent's Brief Regarding Claims A(1)(e) and A(2)(b), filed Jun. 23, 2003). The Court addressed that motion in a separate order. (Memorandum and Order Denying Petitioner's Second Motion for Reconsideration, filed Jul. 14, 2008).

one additional round of briefing to update the status of
petitioner's outstanding claims.[4] On July 22, 2005 and
October 13, 2005, respectively, respondent and petitioner
each filed their supplemental briefs. (Respondent's
Supplemental Brief, filed Jul. 22, 2005; Petitioner's
Supplemental Brief, filed Oct. 13, 2005).

**BACKGROUND**

This case arose on May 29, 1979, when plainclothes
undercover Sheriff's deputies drove up to petitioner's house
in unmarked cars to serve a search warrant based on an
informant's tip that drugs could be purchased from
petitioner's step brother, with whom petitioner resided.[5]
The deputies announced their presence and heard sounds
indicating the possible destruction of narcotics, so they
broke down the front door and entered the house with weapons

---

[4]    Petitioner filed a second motion for reconsideration of
the Court's October 5, 1999 Order denying petitioner an
evidentiary hearing on Claim A(1)(d), that trial counsel was
ineffective for failing to investigate and present evidence
impeaching Acker, and Claim A(2)(a), that the prosecution
deprived petitioner of due process when it failed to
disclose exculpatory information about Acker. (Notice of
Motion and Motion for Reconsideration; Memorandum of Points
and Authorities; Declarations, Exhibits, filed under seal
Oct. 17, 2005; see also Notice of Filing Public Version of
Motion for Reconsideration; Memorandum of Points and
Authorities; Declarations [Redacted], filed Nov. 3, 2005).
The Court has addressed that motion in a separate order.

[5]    The facts of the case come from the California Supreme
Court opinion affirming petitioner's conviction and death
sentence on direct appeal. People v. Gonzalez, 51 Cal. 3d
1179, 1199-1205 (1990), cert. denied sub nom. Gonzalez v.
California, 502 U.S. 835 (1991).

drawn.   Petitioner, who claims he did not know the men were deputies, fired one shot at an entering deputy, killing him. Another deputy shot petitioner, who paramedics carried to an ambulance.   Deputies saw petitioner raise his left fist and say "Viva Puente," a salute to the local street gang, and a deputy heard him call out "puto," meaning "fag."

On the way to the hospital, approximately two hours after the incident, petitioner told a Sheriff's deputy he did not know the entering men were police officers. However, William Acker, a jailhouse informant facing multiple murder and armed robbery charges, testified that petitioner knew the police were going to raid his house, that he planned to shoot an officer, and that he thought the officers would then retreat, allowing him to escape.

The guilt phase jury convicted petitioner of murder and found true the special circumstance that he intentionally killed a police officer engaged in the performance of his duties.   After the first penalty jury deadlocked, a mistrial was declared, and a second jury, deciding only the penalty phase, returned a death verdict.

After his conviction, petitioner filed his automatic direct appeal, and an original and a supplemental petition for writ of habeas corpus, in the California Supreme Court, which that court consolidated for hearing.   In People v. Gonzalez, 51 Cal.3d 1179 (1990), cert. denied sub nom.

1  Gonzalez v. California, 502 U.S. 835 (1991), the California

2  Supreme Court, with two dissenting opinions, affirmed the

3  judgment, denied the habeas petitions, and, in response to

4  respondent's petition for a writ of mandate, denied

5  post-judgment discovery the Superior Court had ordered.

6

7                          **STANDARD OF REVIEW**

8

9       As the Court previously ruled, the Antiterrorism and

10  Effective Death Penalty Act of 1996 governs this case

11  because the original petition was filed after AEDPA's

12  effective date of April 24, 1996.  (Ruling on Respondent's

13  Motion for Reconsideration of Application of AEDPA, supra,

14  at 2-3).  See Woodford v. Garceau, 538 U.S. 202, 210 (2003).

15

16       Under AEDPA, petitioner is entitled to relief if the

17  state court's adjudication of his claims on the merits

18  (1) resulted in a decision that was contrary to, or involved

19  an unreasonable application of, clearly established federal

20  law, as determined by the United States Supreme Court; or

21  (2) resulted in a decision that was based on an unreasonable

22  determination of the facts in light of the evidence

23  presented in state court.  28 U.S.C. § 2254(d); Price v.

24  Vincent, 538 U.S. 634, 639 (2003).  A state court's decision

25  is "contrary to" clearly established federal law "if the

26  state court arrives at a conclusion opposite to that reached

27  by [the Supreme] Court on a question of law or if the state

28  court decides a case differently than [the Supreme] Court

                                    11

has on a set of materially indistinguishable facts."

<u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  A state

court's decision is an unreasonable application of clearly

established federal law "if the state court identifies the

correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the

facts of the prisoner's case." 529 U.S. at 413.  Where the

state court has made a factual determination in the course

of a habeas proceeding, that determination "shall be

presumed to be correct. The applicant shall have the burden

of rebutting the presumption of correctness by clear and

convincing evidence."  28 U.S.C § 2254(e)(1).


**PETITIONER'S CLAIMS**


A.   <u>Claim A(1)(e)</u>


In claim A(1)(e), petitioner alleges that trial counsel

was ineffective for (1) failing to investigate and present

evidence that William Acker acted as a government agent when

he elicited a confession from petitioner; and (2) as a

result, failing to move to exclude petitioner's confession.

(Crctd. Pet., at 8; <u>see also</u> Petition for Writ of Habeas

Corpus, <u>In re Gonzalez</u>, Cal. S. Ct. Case No. Crim. 24041, at

2, 7, 10 [Lodged Doc. # C1]; Declaration of Perry S. Reich,

<u>id</u>., at 12-13; Declaration of Richard C. Chier, ¶ 6, <u>id</u>., at

16; Amended Petition for Writ of Habeas Corpus and Traverse,

12

In re Gonzalez, supra, at 2, 43, 44-48 ("Am. Pet. & Tr.")
[Lodged Doc. # C4] (state court analogue to claim A(1)(e))).

### 1.   Claim A(1)(e) is Conclusory

As alleged in the corrected petition and supporting
memorandum of points and authorities, claim A(1)(e) is vague
and conclusory.  No separate section of the memorandum of
points and authorities deals with claim A(1)(e).  This lack
of specificity warrants dismissal of the claim.  Campbell v.
Wood, 18 F.3d 662, 679 (9th Cir.) (Evidentiary hearing not
required on allegations that are "'conclusory and wholly
devoid of specifics.'") (internal cite omitted), reh. and
reh. en banc denied, 20 F.3d 1050 (9th Cir.), cert. denied,
511 U.S. 1119 (1994); James v. Borg, 24 F.3d 20, 26 (9th
Cir.) ("Conclusory allegations which are not supported by a
statement of specific facts do not warrant habeas relief."),
cert. denied sub nom. James v. White, 513 U.S. 935 (1994).

### 2.   Claim A(1)(e) is Without Merit

Even viewing claim A(1)(e) in light of the record as a
whole, the claim **is** without merit.

Claim A(1)(e) alleges ineffective assistance of trial
counsel.  To prevail on this claim, petitioner must
demonstrate (1) "that counsel's representation fell below an
objective standard of reasonableness" and (2) "that there is

1  a reasonable probability that, but for counsel's

2  unprofessional errors, the result of the proceeding would

3  have been different."  Williams v. Taylor, 529 U.S. 362,

4  390-91 (2000); Strickland v. Washington, 466 U.S. 668,

5  690-93 (1984).  The Strickland standard is "clearly

6  established federal law" for purposes of AEDPA.  28 U.S.C.

7  § 2254(d)(1); Bell v. Cone, 535 U.S. 685, 693 (2002);

8  Shackleford v. Hubbard, 234 F.3d 1072, 1079-80 (9th Cir.

9  2000), cert. denied, 534 U.S. 944 (2001).

10

11       Counsel is not ineffective for failing to make a motion

12  that is meritless.  Jackson v. Calderon, 211 F.3d 1148, 1155

13  (9th Cir. 2000) ("Jackson's counsel . . . had no grounds for

14  moving to suppress the statement, and his decision not to

15  make such a motion does not constitute deficient

16  performance."), cert. denied sub nom. Jackson v. Woodford,

17  531 U.S. 1072 (2001); Lowry v. Lewis, 21 F.3d 344, 346 (9th

18  Cir.) ("A lawyer's zeal on behalf of his client does not

19  require him to file a motion which he knows to be meritless

20  on the facts and the law."), cert. denied, 513 U.S. 1001

21  (1994).  Thus, the outcome of petitioner's ineffective

22  assistance claim turns on whether a motion to suppress

23  Acker's testimony about petitioner's statements would have

24  been successful.

25

26       In a line of cases from Massiah v. United States, 377

27  U.S. 201 (1964), through United States v. Henry, 447 U.S.

28  264 (1980), to Maine v. Moulton, 474 U.S. 159 (1985), the

United States Supreme Court has held that the State violates the Sixth Amendment when, acting through an undisclosed agent, it "deliberately elicit[s]" incriminating statements from an accused "after he ha[s] been indicted" and his right to counsel has attached.  Massiah, 377 U.S. at 206; see also Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986); Moulton, 474 U.S. at 176- 77; Henry, 447 U.S. at 269.

Petitioner's right to counsel had attached when he spoke with Acker.  (See Am. Pet. & Tr., supra, at 9 (stating that Acker first spoke with petitioner "[i]n early July, 1979, one week and one half after the preliminary hearing . . ..")).  However, at least one other element of a Massiah claim, that Acker have acted at the relevant time as a government agent, is absent.

The California Supreme Court ruled on petitioner's analogous state habeas claim that petitioner failed to state a Massiah claim because he failed to show that Acker acted at the behest of the government when petitioner spoke to Acker.[6]  See People v. Gonzalez, 51 Cal. 3d at 1240.

_____

[6]    The Court stated:

The critical issue for Massiah/Henry purposes is the government's 'knowing exploitation' of an opportunity to coax information from a formally charged suspect in the absence of his lawyer.  The accused's rights are not infringed by the government's mere acceptance of information gathered by an inmate on his own initiative, even if the authorities have a general policy of encouraging inmates to listen and report.

1    For there to be a <u>Massiah</u> violation of a defendant's

2 Sixth Amendment right to counsel, the person eliciting the

3 incriminating information must be acting as a government

4 agent.  If the government directs an individual to elicit

5 incriminating statements from a defendant, it violates the

6 Sixth Amendment.  If, however, the state obtains

7 incriminating statements "by luck or happenstance," <u>Maine v.</u>

8 <u>Moulton</u>, 474 U.S. 159, it does not violate the Sixth

9 Amendment.  Similarly, generally, an informant who acts as

10 an "entrepreneur" or "volunteer" in giving unsolicited

11 information to the government is not an "agent" for <u>Massiah</u>

12 purposes.  <u>See</u>, <u>e.g.</u>, <u>Kuhlmann</u>, 477 U.S. at 459 ("[A]

13 defendant does not make out a violation of [the Sixth

14 Amendment right identified in <u>Massiah</u>] simply by showing

15 

16    Acker insisted on the stand that he elicited
   information from defendant entirely on his own
17   initiative, and without official knowledge,
   promises, or encouragement.  Neither the trial
18   record nor the results of appellate counsel's
   exhaustive habeas corpus investigation undermines
19   this claim.  There are, to be sure, ample
   indications that in the months and years after
20   Acker's July 1979 conversations with defendant,
   Acker frequently informed and testified for the
21   authorities, and that he received substantial
   benefits for his cooperation.  However, neither the
22   record at trial nor counsel's investigation
   discloses evidence that Acker's history of
23   cooperation began before July 1979. [fn.]
   Absent evidence of direct motivation by the police
24   in this case, or of a prior 'working relationship'
   between Acker and the authorities from which such
25   encouragement might be inferred, there is no basis
   to hold the police accountable for Acker's decision
26   to question defendant.  Thus, defendant has failed
   to state a prima facie case that evidence of a
27   potentially meritorious <u>Massiah/Henry</u> claim was
   overlooked or withheld.[fn.]  . . .

28 51 Cal. 3d at 1240-41 & n.37.

16

that an informant . . . voluntarily reported his incriminating statements to the police."); United States v. Brink, 39 F.3d 419, 423 (3d Cir.1994) ("An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past."); United States v. York, 933 F.2d 1343, 1356 (7th Cir.) (the facts suggested the informant was an "entrepreneur" who hoped to sell information to the government, not a government agent).  As the Court explained in Kuhlmann, supra:

> [T]he primary concern of the Massiah line of
> decisions is secret interrogation by investigatory
> techniques that are the equivalent of direct police
> interrogation.  Since 'the Sixth Amendment is not
> violated whenever--by luck or happenstance--the
> State obtains incriminating statements from the
> accused after the right to counsel has attached,' a
> defendant does not make out a violation of that
> right simply by showing that an informant, either
> through prior arrangement or voluntarily, reported
> his incriminating statements to the police.
> Rather, the defendant must demonstrate that the
> police and their informant took some action, beyond
> merely listening, that was designed deliberately to
> elicit incriminating remarks.

477 U.S. at 459 (internal citations omitted); see also

Robinson v. Clarke, 939 F.2d 573, 576 (8th Cir. 1991) (no
Sixth Amendment violation where government did not ask
informant to solicit information).

Furthermore, most "circuits agree that an informant
becomes a government agent . . . only when the informant has
been instructed by the police to get information about the
particular defendant." United States v. Birbal, 113 F.3d
342, 346 (2d Cir.) (emphasis added; citing cases), cert.
denied, 522 U.S. 976 (1997); see, e.g., Brooks v. Kincheloe,
848 F.2d 940, 945 (9th Cir.1988) (though informant solicited
information from defendant before going to police, no
Massiah violation where state court findings "establish that
the detectives did not request Kee to elicit any information
from defendant."); but see United States v. Brink, 39 F.3d
419, 424 (3d Cir.1994) ("Since the government was aware of
Scott's propensity to inform on his cellmates, we believe
that placing him in a cell with a pretrial detainee could
represent a deliberate effort to obtain incriminating
information from a prisoner in violation of his Sixth
Amendment right to counsel.").[7]

---

[7]    AEDPA limits the scope of clearly established federal
law to the holdings (as opposed to the dicta) of the United
States Supreme Court at the time of the state-court decision
under review. See Lockyer v. Andrade, 538 U.S. 63, 71
(2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).  Only
the Supreme Court's holdings are binding on the state courts
and only those holdings need be reasonably applied.  Bruce
v. Terhune, 376 F.3d 950, 954 (9th Cir. 2004).
Nevertheless, circuit law may be "persuasive authority" for
purposes of determining what law is clearly established and
whether a state court decision is an unreasonable

1    The record indicates that Acker met with law

2    enforcement in petitioner's case after petitioner made his

3    incriminating statements to Acker.[8]  (See 3 R.T. 603 (Acker

4    went to law enforcement with information about petitioner

5    "[t]he day I was sentenced" which was after he spoke to

6    petitioner), 623 (Acker spoke to petitioner before speaking

7    to any police officer or deputy sheriff, and the police did

8    not ask Acker to talk to petitioner in this case: "no.  He

9    just talked to me."); 19 R.T. 4346 ("He talked to me until

10   the day I was moved, and that was one day after I gave a

11   statement to the detectives of the case.")).  See Randolph

12   v. People of the State of California, 380 F.3d 1133, 1144

13   (9th Cir. 2004) ("Any statements . . . made by Randolph

14   before Moore met with the prosecution team cannot be the

15   ─────────────────

16   application of United States Supreme Court law.  Duhaime v.
     Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

17   [8]   The transcript of Acker's taped interview with law
18   enforcement shows Acker said he had spoken with petitioner
     every day since July 7, 1979 and that, on July 20, 1979,
     Acker made his taped statement to Sergeant Verdugo and
19   Deputy Overlease.  (See Exhs. to Pet., Exh. 13, at 1-2).
     Sergeant Verdugo stated in the interview that law
20   enforcement had spoken with Acker "on one previous occasion
     . . . and he related to us facts which he had learned from"
21   petitioner.  (Id., at 1).  Apparently referring to this and
     other passages in the transcript, petitioner alleged in his
22   state habeas petition that "[t]he text of the transcript [of
     Acker's statement] reveals that there were in fact, earlier
23   meetings" between Acker and law enforcement.  (Am. Pet. &
     Tr., supra, at 9 (referring to 1 Exhs. to Am. Pet. & Tr.,
24   Exh. A [Lodged Doc. # C4]); see id., at 184 (containing the
     above passage), 185 ("Q.  All right, getting - Bill, going
25   back, you stated to us . . ."), 187 (Acker referring to "our
     first interview"), 191 (Sergeant Verdugo: "Okay, we're
26   getting into a subject here which we encountered.")).
     However, nothing in the transcript suggests Acker spoke to
27   law enforcement about petitioner's case before petitioner
     made the incriminating statements to Acker or more than once
28   before the transcribed interview.

19

1   basis of a <u>Massiah</u> violation.").

2

3        However, in connection with claim C, which alleges the

4   California Supreme Court's denial of discovery in

5   petitioner's post-conviction state habeas proceedings

6   violated due process (Crctd. Pet., at 13), petitioner's

7   memorandum of points and authorities refers to facts about

8   Acker's role in other criminal cases, mostly post-dating

9   petitioner's, which "could have been used as the basis for

10  further investigation of the fact that Mr. Acker was used by

11  the government to obtain confessions . . .." (Crctd. Ps&As,

12  at 153; <u>see</u> <u>also</u> Am. Pet. & Tr., <u>supra</u>, at 1-41 (history of

13  Acker's interactions with law enforcement)).

14

15        Specifically, an investigative report in <u>People v. John</u>

16  <u>Anthony Torres</u> states that, in August or September, 1978,

17  Acker was in the Los Angeles County Jail as a <u>pro</u> <u>per</u>

18  defendant.  (Exhibits in Support of Petition for Writ of

19  Habeas Corpus, filed Sept. 20, 1996 ("Exhs. to Pet."), Exh.

20  40, at 1).  According to Acker, an inmate gave Acker a

21  telephone number to call and a message to give to Torres on

22  a piece of paper.  (<u>Id</u>.).  Acker made the call and later

23  told the police he thought the message concerned the

24  purchase of drugs.  (<u>Id</u>.).  Three months later, on January

25  15, 1979, someone murdered Laouarna Gillis, a Los Angeles

26  Police Department Sergeant's daughter.  (Exhs. to Pet., Exh.

27  41 (newspaper account)).  The case was investigated, but the

28  District Attorney filed no charges, and Torres was the sole

suspect.  (Exhs. to Pet., Exh. 42).  In mid-1979, also

before meeting petitioner, Acker returned from prison to the

Los Angeles County Jail to face murder and robbery charges.

(Exhs. to Pet., Exh. 40, at 2).  In early March, 1980, prior

to his testimony in petitioner's first penalty trial, Acker

was housed in the hospital section of Los Angeles County

Jail, when Torres was returned from Soledad Prison and

placed in the next cell.  (Id. at 1-2).  Acker claimed that

during the first week of Torres' arrival he heard a song on

the radio and commented about it to Torres, at which point

Torres allegedly told him he had "made his bones" with the

Mexican Mafia by killing Ms. Gillis.  (Id., at 2).


     After petitioner's trial, the prosecution disclosed to

the defense a transcript of Acker's testimony of January 22,

1981 in People v. Keith Eugene Renfrow, Los Angeles County

Sup. Ct. Case No. A143615.  (Exhs. to Pet., Exh. 43).  Acker

testified that, on October 17, 1980, Renfrow, with whom

Acker was sharing a cell, approached Acker and asked Acker

to "get ahold of homicide" because Renfrow "wanted to tell

them about some other cases for possibility [sic] of

receiving some aid on this case."  (Id., at 9-10).  Acker

"advised him not to," but Renfrow "convinced me he was

sincere, so I told him okay."  (Id., at 10).  Acker

telephoned two homicide detectives he had known since early

1979, when they had accused him of a murder, and told them

Renfrow wanted to talk to them.  (Id., at 11, 13).

Acker and Renfrow were housed in the same cell for
three months prior to Renfrow's confession in October 1980.
(Exhs. to Pet., Exh. 43, at 14).  Acker testified he liked
Renfrow, they were on friendly terms, and he showed Renfrow
"a few moves" of karate.  (<u>Id</u>., at 16).  Acker testified
that he had given testimony in three cases in addition to
Renfrow's.  (<u>Id</u>.).  Acker claimed he was "[a]bsolutely not"
trying to obtain information from Renfrow.  (<u>Id</u>., at 17).

Deputy Sheriff Reginald Yamato, who received Acker's
call, testified he had last seen Acker two or three months
before October 17, 1980, and had not known Acker and Renfrow
were cell mates, or even that they were acquainted.  (Exhs.
to Pet., Exh. 43, at 21-23, 28).  He and his partner, Bob
Morck, visited Acker and Refrow in the jail hospital ward,
when Renfrow gave the deputies the information about the
crimes he had promised.  (<u>Id</u>., at 22-26).

Renfrow testified that before he was placed in Acker's
cell, Acker had befriended him, passing him cigarettes.
(Exhs. to Pet., Exh. 43, at 46).  When he became an adult
for jail system purposes, Renfrow asked to be placed in
Acker's cell for protection, to avoid being housed with the
general prison population.  (<u>Id</u>., at 46-47).  Acker often
asked Renfrow questions about his case and "pumped him" for
information.  (<u>Id</u>., at 48).  Three or four times a week,
Acker would leave the cell, telling Renfrow he had called

22

1   homicide detectives.  (Id., at 52-53).  Acker had, in

2   Renfrow's words, "a pipeline to homicide."  (Id., at 53).

3

4       A memorandum from the Ventura County District

5   Attorney's Office shows that, on November 21, 1985, Acker

6   told an investigator with that office that he had spoken to

7   Theodore Francis Frank, the defendant in People v. Theodore

8   Frank, in 1978 and that Frank had confessed to him.  (Exhs.

9   to Pet., Exh. 44, at 1-3).  The report recounts that Acker

10  told the investigator Acker met Frank after Acker had beaten

11  up an inmate involved with a child prostitution ring.  (Id.,

12  at 1).  According to Acker, Frank defended, and criticized

13  Acker for beating up, the other inmate, to which Acker

14  replied by saying the inmate was lucky Acker did not kill

15  him.  (Id.).  Frank told Acker he "had a rape case himself,"

16  to which Acker responded, "Yeah, but I'm quite sure it isn't

17  baby rape."  (Id., at 2).  Frank confessed to Acker that he

18  kidnaped, raped and murdered a woman, telling Acker "he

19  wanted to see what it felt like, he wanted death to be the

20  climax."  (Id.).  Acker told Frank he did not want to talk

21  about it, and Frank replied, "Well, you're in here for

22  murder."  (Id., at 2).  Frank later apologized for saying

23  this, claimed "it was just an experience," that Acker should

24  "accept his way of thinking," and that he was not insane but

25  knew what he was doing; "some people use drugs and then they

26  take that big shot of heroin and never do it again."  (Id.).

27  Frank told Acker, however, that this was not the crime Frank

28

                              23

was in jail for, and he refused when Acker asked, to explain
why he was in custody.[9]  (Id.).

Petitioner alleged in his evidentiary hearing motion
that these documents "provide evidence that, contrary to his
testimony at petitioner's trial, Mr. Acker had an ongoing
relationship with law enforcement before he allegedly
approached petitioner."  (Mot. for Evid. H., at 35).
Referring to Renfrow's statement that Acker had a "pipeline
to homicide," petitioner alleged that "[u]nless Mr. Acker's
pipeline had been recently constructed, Mr. Acker had an
ongoing relationship with two detectives from homicide prior
to being involved with petitioner."  (Mot. for Evid. H., at
35-36).  Petitioner sought discovery and an evidentiary
hearing to develop these facts, since Acker was
"unavailable" and "housed out of state under an assumed
name," and two detectives Refrow referred to were "never
identified."  (Id., at 36).

In ruling on petitioner's evidentiary hearing motion,
the Court deferred ruling on claims A(1)(e) and A(2)(b) to
allow petitioner to seek discovery on them.  (Order on
Petitioner's Motion for Evidentiary Hearing, filed Oct. 5,
1999, at 19, 27).  The parties stipulated to discovery

---

[9]    In 1980, Acker testified at the penalty phase of
petitioner's trial that he did not talk to Theodore Frank
"ever."  (19 R.T. 4404).

1    concerning William Acker, and the Court approved the

2    stipulation.  (Stipulation and Proposed Order, filed Mar. 8,

3    2000).  In his motion for reconsideration of the Court's

4    Order on respondent's motion for judgment on the pleadings,

5    petitioner stated, "[a]fter discovery, petitioner has

6    concluded that there is no additional evidence in support of

7    claims A(1)(e) and A(2)(b) and does not present additional

8    evidence on these claims."  (Notice of motion and Motion for

9    Reconsideration, filed Jun. 5, 2003, at 7 n.7).  The record

10   pertaining to claim A(1)(e) is now complete.

11

12       The California Supreme Court's decision on the state

13   court analogue to claim A(1)(e) is neither contrary to, nor

14   an unreasonable application of, clearly established federal

15   law.  28 U.S.C. § 2254(d)(1).  Its conclusion that Acker

16   elicited information from petitioner on his own, without

17   official knowledge, promises, or encouragement is a

18   reasonable determination of the facts in light of the

19   evidence presented in state court.  Even taking into account

20   the additional evidence petitioner presents here, no

21   evidence shows that Acker acted in petitioner's case at the

22   behest of the government or that, prior to petitioner's

23   trial, a relationship existed between Acker and law

24   enforcement from which it could be inferred that Acker was

25

26

27

28

law enforcement's agent.[10]   28 U.S.C. § 2254(d)(2).   After

the opportunity for discovery, petitioner has not presented,

and cannot come up with, clear and convincing evidence to

controvert, or rebut the presumption of correctness

applicable to, the state court's finding that Acker did not

act as law enforcement's agent in petitioner's case.   28

U.S.C. § 2254(e)(1).


     Claim A(1)(e) is without merit.


B.   <u>Claim A(2)(b)</u>


     In claim A(2)(b), petitioner alleges the prosecution

knowingly used Acker's false testimony.   (Crctd. Pet., at 9;

<u>see also</u> Ap. Op. Br., at 36-38 [Lodged Doc # B1]; Am. Pet. &

Tr., <u>supra</u>, at 3, 42, 50-54 (state analogue to claim

A(2)(b)).   Petitioner does not identify the specific

_____

[10]    Evidence of Acker's involvement in the Torres, Renfrow
and Frank cases, to the extent it is validly before this
Court, <u>see</u> 28 U.S.C. § 2254(e)(2), does undermine the state
court's findings that "neither the record at trial nor
counsel's investigation discloses evidence that Acker's
history of cooperation began before July 1979" and that
Acker had provided information only in "isolated cases"
prior to 1979.  <u>People v. Gonzalez</u>, 51 Cal. 3d at 1240-41 &
n.37.  However, even this evidence indicates only that Acker
acted on his own, not that he had a "relationship" with, or
acted at the behest of, the authorities.  (<u>See</u>, <u>e.g.</u>, Exhs.
to Pet., Exh. 43, at 17 (Acker claimed that he was
"[a]bsolutely not" trying to obtain information from Renfrow
and that detectives "didn't even know" Renfrow was in
Acker's cell).  Evidence of Acker's actions in other cases
would not establish that he acted as a state agent when he
elicited information from petitioner.

portions of Acker's testimony he claims were false, but this
allegation appears to be directed at three elements:

> (a) Acker's testimony at the guilt phase in which,
> petitioner alleges, Acker testified that his wife, not
> he, committed the Hawaii murders for which they were
> both convicted (Crctd. Ps&As, at 108-112 (<u>citing</u> 3 R.T.
> 603-04 and Exhs. to Pet., Exh. 18));

> (b) Acker's guilt phase testimony that the only benefit
> he hoped to receive for testifying was protective
> custody and his second penalty phase claim that he was
> testifying because "it felt good, doing something that
> I knew was right" (<u>See</u> Crctd. Ps&As, at 112-14 (<u>citing</u>
> 3 R.T. 603, 607-09; 19 R.T. 4425-26)); and

> (c) Petitioner's allegation, based on his <u>Massiah</u>
> claim, that the prosecution knew Acker "had an ongoing
> relationship with law enforcement before he allegedly
> approached petitioner" but allowed Acker to testify to
> the contrary at petitioner's trial.[11]   (Mot. for Evid.

---

[11]   In his evidentiary hearing motion, petitioner said the
facts of this claim were not yet fully adduced because
petitioner needed additional discovery. (Motion for Evid.
H., at 35).  As noted in connection with claim A(1)(e),
discovery is now complete.  (Jun. 5, 2003 Recon. Mot.,
<u>supra</u>, at 7 n.7).

   If petitioner intends claim A(2)(b) to include elements
in addition to those outlined above, it is impossible to
derive them from the pleadings or record, and, as to any

H., at 35).

The California Supreme Court discussed a narrower "false testimony" claim raised in petitioner's direct appeal: that "the prosecutor knowingly made use of false testimony at the guilt phase by allowing jailhouse informant Acker to testify untruthfully that he 'didn't like gangs' and that he merely desired a transfer to an out-of-state prison in return for his testimony." 51 Cal. 3d at 1213. (See Ap. Op. Br., at 36-38). The state court found "no material discrepancy in Acker's testimony" because petitioner failed to prove that Acker's consistent denials of gang membership, or his statements about the benefits he was promised or given for his testimony, were false. 51 Cal. 3d at 1213. The state court found that, even if Acker's testimony was false, the falsehood was not material:

Even if the authorities did assist in the tattoo removal for purposes of protecting Acker's identity, this was but a logical extension of the protective prison transfer he had always acknowledged he hoped to receive. Moreover, any inference that Acker had received benefits for his cooperation in this and other cases by the time of the second penalty trial does not establish that

such additional elements, the claim is denied as vague and conclusory. James v. Borg, supra, 24 F.3d at 26.

his contrary guilt phase testimony was false when
given.

In any event, considering the information the
jurors already had about Acker, additional
revelations that he might be a gang member, and
might have accepted protective help from the
authorities, would not likely have lessened his
credibility in their eyes to any substantial
degree.

Id. at 1213-14.

It is clearly established that the prosecution's
presentation of false evidence violates due process.  Napue
v. Illinois, 360 U.S. 264, 269 (1959) ("[A] State may not
knowingly use false evidence, including false testimony, to
obtain a tainted conviction . . . ."); Phillips v. Woodford,
267 F.3d 966, 984-85 (9th Cir. 2001).  If the false evidence
is material--reasonably likely to have affected the jury
verdict--the court must reverse the defendant's conviction.
United States v. Agurs, 427 U.S. 97, 103 (1985); Phillips v.
Woodford, 267 F.3d at 985; see also Killian v. Poole, 282
F.3d 1204, 1208 (9th Cir. 2002) (issue is whether "there is
a reasonable probability that [without all the perjury] the
result of the proceeding would have been different")
(alteration in original; quotation marks omitted), cert.
denied, 537 U.S. 1179 (2003).

In addition, the failure to disclose the false nature of a witness' testimony violates the prosecution's obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963). Under Brady and its progeny, due process obligates the prosecution to disclose material exculpatory evidence on its own and without request.   See Kyles v. Whitley, 514 U.S. 419, 432-34 (1995); United States v. Bagley, 473 U.S. 667, 682 (1985); Brady v. Maryland, 373 U.S. 83, 87 (1963). To establish a Brady violation, petitioner must demonstrate that the government suppressed material, favorable information and that this suppression prejudiced him. United States v. Ciccone, 219 F.3d 1078, 1085 (9th Cir. 2000).   The Brady rule applies to both exculpatory and impeachment evidence.   United States v. Bagley, 473 U.S. at 676; Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997) ("Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses."), cert. denied, 523 U.S. 1133 (1998).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Kyles, 514 U.S. at 433; Bagley, 473 U.S. at 682.  A "reasonable probability" does not require showing by a preponderance that the outcome would have been different, Kyles, 514 U.S. at 433-35, but is only a probability sufficient to undermine confidence in the outcome."  Bagley, 473 U.S. at 682.

Of the three factual elements of claim A(2)(b) set out above, the first is easily disposed of.  Acker never testified in the guilt phase that Maryann Acker committed the Hawaii murders for which both of them were convicted. Acker's relevant cross-examination testimony reads:

Q.  Had you also informed on your wife concerning murders in Hawaii?

A.  Had I - had I testified against my wife?  No.

Q.  I asked you if you'd informed on your wife. Did you?

A.  I can't answer that the way you're saying it.

Q.  Well, . . . did you tell investigating officers about your wife's role in a murder?

A.  About my own, too.

Q.  All right.  But you told about your wife's role; isn't that correct?

A.  Yes.

(3 R.T. 604; see also 3 R.T. 605-06 (Acker claiming "I never really informed on my wife" but admitting he gave the police information about what she did or did not do), 621 (Acker admitting he "told something to the authorities" prior to petitioner about "my wife and me")).  Thus, Acker admitted he told the authorities about his and his wife's role in the Hawaii murders, but he never testified to what he said his wife's role was.

With respect to the third element of claim A(2)(b), the

31

1    prosecution's failure to disclose Acker's alleged ongoing

2    relationship with the police, the California Supreme Court

3    found that Acker, in fact, did not have an ongoing

4    relationship with law enforcement before meeting petitioner,

5    albeit Acker did provide law enforcement with important

6    information in the <u>Torres</u>, <u>Renfrow</u> and <u>Frank</u> cases.  <u>See</u>

7    <u>People v. Gonzalez</u>, 51 Cal. 3d at 1241.  This finding, with

8    which this Court agrees, is reasonable in light of the

9    evidence before the state court.

10

11       On the second element of claim A(2)(b), based on

12   Acker's allegedly false testimony about his motives for

13   assisting the police and testifying, the California Supreme

14   Court, in ruling on the more limited claim petitioner

15   proffered on direct appeal, found petitioner had failed to

16   present any evidence that Acker testified falsely or that,

17   if he did, that the falsehoods were material.  <u>People v.</u>

18   <u>Gonzalez</u>, 51 Cal. 3d at 1213-14.  In reviewing the broader

19   claim petitioner has presented here, the Court concurs.  The

20   California Supreme Court's finding that Acker's testimony,

21   that he wanted an out of state transfer, contained "no

22   material discrepancy," <u>Id.</u>  at 1213, is reasonable in light

23   of the evidence presented to the state court.

24

25       Acker's statement in the penalty phase, that he

26   testified because "it felt good, doing something that I knew

27   was right" (19 R.T. 4426), also was not misleading in light

28

                              32

of the other evidence presented regarding what Acker

received for his testimony.[12]   The penalty phase jury already

knew Acker had pled guilty to robbery murder (19 R.T. 4360-

61); that, after petitioner spoke with Acker, Acker had

asked the investigating detective on Acker's robbery murder

case, Detective Ahn, to contact the investigators in

petitioner's case because Acker feared he would not survive

---

[12]   The relevant testimony occurred on redirect examination
by the prosecution, and reads:

> Q.  . . . [¶]  As far as testifying, as Mr.
> Bencangey asked you, what you were explaining to
> him, the reasons why you felt that you feel that
> what you have –
>
> A.  Well, see, I was asked a question, 'Why are you
> doing all this and getting nothing?'
> I was asked that by some other informers.  They
> were getting out.  'We're doing this.  How come
> you're not?'
>
> And I felt so bad, I – I started looking at it,
> 'Why not?'
>
> I – I had – I had to ask myself that.  That's when
> I felt I – I – this is when this came out, I knew
> why I was doing some of the things I was doing,
> because I already had made out-of-state play, on
> Gonzalez, I didn't need LaScola, I didn't get
> nothing for LaScola, even if it would have went [to
> trial], I wouldn't have gotten nothing.
>
> It just felt nice.  It felt good, doing something
> that I knew was right.  I've got – I could have
> went on Binanca and I could have went on Buono, but
> I don't feel as though they gave me the real thing.
> I feel as though they were leading me on.
>
> So I didn't even – I never went to them on it.  A
> lot of times I could have turned on a lot of
> people, but they were faking me out.  Gonzalez was
> real.

(19 R.T. 4425-26).

33

in California's penal institutions due to the fact "I hate

gangs," "they hate me," and Acker wanted to "motivate Ahn"

to get Acker a transfer out of state (19 R.T. 4361, 4374,

4778, 4380-82); that Acker had given law enforcement

information on a murder case he and his wife were involved

in and on a murder of one County Jail inmate by another (19

R.T. 4376-77); that it was "possible" Acker had given

information in six or seven other cases, including some,

such as the <u>LaScola</u> and <u>Torres</u> cases, in which he testified

(19 R.T. 4379-80, 4404-06); that Acker had a tattoo on his

back removed which said "Paramount" but which Acker claimed

indicated the City he was from and not a gang affiliation

(19 R.T. 4410, 4415-16, 4422-24); that Acker had <u>not</u> been

given a life without parole sentence (19 R.T. 4413); and

that Acker had participated in robberies and "could kill

somebody if they had it coming."[13]  (19 R.T. 4425).  Thus,

---

[13]   On Acker's gang membership, Los Angeles County Jail inmate and Bassett Grande gang member Martin Michael Ybarra, testified for the defense at petitioner's second penalty trial that he met Acker in jail and that Acker claimed he "belonged to Paramount":

Q.  And did you ever have any occasion to discuss anything about Bassett Grande with Mr. Acker?

A.  Yes.  He asked me one time if I belonged to a gang.  I told him I belonged to Bassett, so I asked him if he belonged to anything, and he said he belonged to paramount.

Q.  Now, do you know anything about Paramount?

A.  Yeah.  When I was going into the juvenile, I spent a lot of time with the guys from Varrio Paramount 13.

34

Acker's testimony, that he was testifying because it felt
good to do something right, was not misleading or material.

Whether considered individually or collectively, the
evidence of Acker's alleged perjury is neither probative of
perjury nor material.  Claim A(2)(b) is meritless.[14]

C.   Claim A(2)(c)

In claim A(2)(c), petitioner alleges the prosecutor
misstated the law when he made the following statements
during closing rebuttal in petitioner's guilt phase trial:

> Let's just talk about reasonable doubt.  Mr.
> Bengacy talks about it.  There wasn't any
> reasonable doubt.  The defense has to create
> reasonable doubt.
> We proved our case and we called a lot of witnesses
> we really didn't need because we didn't know what
> tack were they going to take, not until maybe –
> what? – an hour ago that we really knew that.

---

Q.   There is such a thing as a Paramount gang?

A.   Yes.

(20 R.T. 4511).

[14]   To the extent Claim A(2)(b), as interpreted here,
contains unexhausted elements, because the claim is broader
than the analogous claim presented to the California Supreme
Court, AEDPA permits the Court to deny such claims on the
merits.  28 U.S.C. § 2254(b)(2).

1    For ten days we have been wrong.  We have been
2    thinking about justifiable homicide and now we are
3    told, no, it's really only voluntary manslaughter.
4    The reasonable doubt has to be created by the
5    defense.  They have not created any reasonable
6    doubt.  Confusion, yes, but reasonable doubt, no.
7    Just because there are different stories that are
8    told, the defendant takes the witness stand and
9    says one thing, that doesn't create a reasonable
10   doubt.

12   (Crctd. Pet., at 8-9; Crctd. Ps&As, at 70-71; 5 R.T. 1178).
13   Petitioner contends this comment invited the jury to shift
14   the burden of proof to the defense.  (Crctd. Ps&As, at 70).

16       In addition, the prosecutor stated at the conclusion of
17   his guilt phase rebuttal:

19   The defense case adds up to only one person, the
20   only person who was there.
21   Now, we didn't hear from Stevie Martinez.  We
22   didn't hear from the six-year-old girl.  We didn't
23   hear from the neighbors.  We didn't hear from
24   anybody.  We only heard – the only person present
25   was Mr. Gonzalez that you heard from and, ladies
26   and gentlemen of the jury, look at the defense.
27   It's empty.  There is nothing to it.  There was no

36

1      defense.

2

3    (5 R.T. 1180).  Petitioner contends: "The prosecutor's

4    comment, with respect to the defendant's failure to produce

5    a six year old child who was at the house, was all the more

6    objectionable since there was no showing that this witness

7    was under petitioner's control or that he ever had the

8    ability to subpoena her, and also erroneously attempted to

9    reverse the burden of proof."  (Crctd. Ps&As., at 70).

10

11      In addressing this claim on direct appeal, the

12   California Supreme Court stated:

13

14      As defendant suggests, the prosecution must prove

15      every element of a charged offense beyond a

16      reasonable doubt.  The accused has no burden of

17      proof or persuasion, even as to his defenses.

18      However, once the prosecution has submitted proof

19      that permits a finding beyond reasonable doubt on

20      every element of a charge, the accused may

21      obviously be obliged to respond with evidence that

22      'raises' or permits a reasonable doubt that he is

23      guilty as charged. [¶]  In this context, the

24      prosecutor's remark was ambiguous.  The remark was

25      proper if it meant only that the prosecution had

26      proved premeditated murder of a peace officer

27      beyond a reasonable doubt, and that the weakness of

28

37

the defense response had left the record devoid of
any basis for reasonable doubt.  The remark was
improper if meant to absolve the prosecution from
its prima facie obligation to overcome reasonable
doubt on all elements.  Because timely objection,
admonition, and instruction would have cured any
prejudicial confusion, defendant's failure to
intervene below waives a direct claim of
misconduct.

People v. Gonzales, 51 Cal. 3d at 1214-15 (citations
deleted).  Treating the claim as one for ineffective counsel
based on counsel's failure to object, the court stated:

The prosecutor's remark was brief and mild.  The
jury received accurate standard instructions that
the People bore the burden of proving defendant
guilty beyond a reasonable doubt, and that he was
presumed innocent until proven guilty.  No
instruction stated or implied that defendant bore
any burden of proof or persuasion.  Defense counsel
in his closing argument reread CALJIC No. 2.90 and
repeatedly emphasized the People's 'very, very,
very high burden.'  The evidence that defendant was
guilty as charged was highly persuasive.  Hence,
counsel's failure to object to the prosecutor's
'reasonable doubt' argument does not undermine

1    confidence in the guilt verdict.

2

3    Id. at 1215 (citations deleted).

4

5        As noted, petitioner procedurally defaulted on this

6    claim by failing to raise a timely objection.[15]  Petitioner

7    has not validly challenged the independence or the adequacy

8    of the contemporaneous objection rule.[16]  Petitioner does

9    contend that the California Supreme Court did not clearly

10   and expressly rest its judgment on the default (Traverse, at

11   45; Ptr's. Surreply on Claims A(2)(C), et al., at 2-4), a

12   contention which a fair reading of the California Supreme

13   Court's decision refutes on its face.  See 51 Cal. 3d at

14   1215 (petitioner's failure to object "waives a direct claim

15   of misconduct").  The California Supreme Court did address

16   the merits of petitioner's prosecutorial misconduct claim,

17   but in the context of the separate claim that petitioner's

18   trial counsel was ineffective for failing to raise a timely

19   _____

20   [15]    "Under the doctrine of procedural default, a petitioner
     who has defaulted on his claims in state court is barred
21   from raising them in federal court so long as the default is
     'pursuant to an independent and adequate state procedural
22   rule.'"  Jackson v. Roe, 425 F.3d 654, 656 n.2 (9th Cir.
     2005) (quoting Coleman v. Thompson, 501 U.S. 722 (1991)).

23   [16]    In the traverse, petitioner notes that, to bar federal
24   review, a procedural default must be independent of federal
     law and adequate to bar federal review of the claim.
25   (Traverse, at 45-46).  However, these conclusory allegations
     have not "place[d] that defense in issue" "by asserting
26   specific factual allegations that demonstrate the inadequacy
     of the state procedure."  Bennett v. Mueller, 322 F.3d 573,
27   585-86 (9th Cir.), cert. denied sub nom. Blanks v. Bennett,
     540 U.S. 938 (2003)

28

                                  39

objection, the argument petitioner raises in this court as
cause to excuse his procedural default.  (Traverse, at 46).

Assuming petitioner's showing of cause is adequate to
overcome procedural default, however, petitioner cannot
obtain habeas relief in this court because the claim's lack
of merit precludes him from establishing prejudice from the
default.[17]  In federal habeas corpus, the standard of review
for prosecutorial misconduct is the narrow one of due
process.  See Darden v. Wainwright, 477 U.S. 168, 181
(1986).  A prosecutor's misconduct violates due process when
it renders a trial "fundamentally unfair."  See id.; Smith
v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of
due process analysis in cases of alleged prosecutorial

---

[17]    Notwithstanding procedural default, a federal court may
review a claim "when a habeas applicant can demonstrate
cause and prejudice for the procedural default."  Dretke v.
Haley, 541 U.S. 386, 393 (2004).

Cause "must be something external to the petitioner,
something that cannot fairly be attributed to him: '[W]e
think that the existence of cause for a procedural default
must ordinarily turn on whether the prisoner can show that
some objective factor external to the defense impeded
counsel's efforts to comply with the State's procedural
rule.'"  Coleman, supra, 501 U.S. at 753 (quoting Murray v.
Carrier, 477 U.S. 478, 488 (1986)).  "Prejudice" means
"actual prejudice as a result of the alleged violation of
federal law."  Coleman, 501 U.S. at 750.  Under the actual
innocence gateway of Schlup v. Delo, 513 U.S. 298 (1995), a
petitioner's procedurally barred claim may be considered on
the merits if his claim of actual innocence is sufficient to
implicate a fundamental miscarriage of justice.  See Majoy
v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002); Bousley v.
United States, 523 U.S. 614, 623 (1998) ("actual innocence"
means factual innocence, not mere legal insufficiency).
Petitioner does not claim actual innocence.

misconduct is the fairness of the trial, not the culpability

of the prosecutor"). The Court reviews such claims "on the

merits, examining the entire proceedings to determine

whether the prosecutor's remarks so infected the trial with

unfairness as to make the resulting conviction a denial of

due process." <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th

Cir.) (cite omitted), <u>cert</u>. <u>denied</u>, 516 U.S. 1017 (1995).


Here, the trial court instructed the jury that the

presumption of innocence "places upon the state the burden

of proving [the defendant] guilty beyond a reasonable doubt"

and then defined reasonable doubt for the jury. (1 C.T.

208; 5 R.T. 1051; R.T. Suppl. at 13 (jury instruction as

read to the jury)). Claim A(2)(c) does not challenge the

correctness of this instruction. Rather, the question in

this AEDPA case is whether "it was unreasonable to conclude

that the prosecutor's argument and remarks did not mislead

the jury into believing" that the burden was on the defense

to establish a reasonable doubt as to petitioner's guilt.[18]

_____

[18]    Although they involved the effect of jury
instructions on the jury's ability to consider mitigating
evidence rather than the burden of proof, the following
comments from <u>Brown v. Payton</u>, 544 U.S. 133 (2005), are
instructive:

    'We think the proper inquiry in such a case is
    whether there is a reasonable likelihood that the
    jury has applied the challenged instruction in a
    way that prevents the consideration of
    constitutionally relevant evidence. . . . [J]urors
    do not sit in solitary isolation booths parsing
    instructions for subtle shades of meaning in the
    same way that lawyers might.  Differences among

41

Brown v. Payton, 544 U.S. 133, 143 (2005) (discussing effect
of prosecutor's argument on penalty jury's ability to
consider mitigating evidence under Cal. Pen. Code § 190.3
"factor (K)").

Petitioner is not entitled to relief on claim A(2)(c).
The California Supreme Court's decision is not contrary to
or an unreasonable application of United States Supreme
Court precedent, and its fact findings are reasonable.  The
trial judge instructed the jury that the prosecution bore
the burden of proof.  (1 C.T. 208; 5 R.T. 1051; R.T. Suppl.
at 13).  The prosecutor told the jury twice in his closing
argument that the prosecutor bore the burden of proving
petitioner guilty beyond a reasonable doubt.  (5 R.T. 1064,
1085).  Defense counsel re-read and commented on the burden
of proof jury instruction, stating it was a "very high
standard, very, very heavy standard, heavy burden."  (5 R.T.
1106-07).  The prosecutor's comments came in rebuttal, in
comments on the strength of the defense case.  Cf. 51
Cal. 3d at 1214-15 ("The remark was proper if it meant only
that the prosecution had proved premeditated murder of a
peace officer beyond a reasonable doubt" and the defense

them in interpretation of instructions may be
thrashed out in the deliberative process, with
commonsense understanding of the instructions in
the light of all that has taken place at the trial
likely to prevail over technical hairsplitting.'

Brown v. Payton, 544 U.S. at 143 (quoting Boyde v.
California, 494 U.S. 370, 380-81 (1990)).

42

response "left the record devoid of any basis for reasonable
doubt."). It was not "unreasonable to conclude that the
prosecutor's argument and remarks did not mislead the jury"
to believe the defense had the burden to prove reasonable
doubt of petitioner's guilt. Payton, 544 U.S. at 143.

The prosecutor's comments regarding the failure of the
defense to produce the six year old girl petitioner claimed
was inside his house at the time of the shooting were not
error.[19] A "prosecutor may properly comment upon a
defendant's failure to present witnesses so long as it is
not phrased as to call attention to defendant's own failure
to testify."[20] United States v. Fleishman, 684 F.2d 1329,

---

[19]   The prosecutor argued:

The defense case adds up only to one person, the
only person who was there.

Now, we didn't hear from Stevie Martinez. We
didn't hear from the six year old girl. We didn't
hear from the neighbors. We didn't hear from
anybody. We only heard – the only person present
was [petitioner] that you heard from and, ladies
and gentlemen of the jury, look at the defense.
It's empty. There is nothing in it. There was no
defense.

The facts of the case proved that the defendant,
[petitioner], is a cop killer.

(5 R.T. 1180-81).

[20]   In Griffin v. California, 380 U.S. 609, 613-15 (1965),
the Supreme Court underscored that the Fifth Amendment right
against self-incrimination bars the prosecution from
commenting upon a defendant's failure to testify. Claim
A(2)(c) does not, and cannot, raise a Griffin claim, since
petitioner testified in the guilt phase.

43

1343 (9th Cir.), <u>cert</u>. <u>denied</u>, 459 U.S. 1044 (1982).  In his

closing argument, petitioner's trial counsel repeatedly

mentioned the child's presence in the house when the

sheriff's deputies entered as a reason why petitioner would

not want to provoke a confrontation.  (5 R.T. 1122, 1123,

1126, 1128, 1130, 1139).  The prosecutor argued that the

defense's failure to produce the six year old showed that

petitioner was the only person present during the shootings

and that his statements about the presence of children were

not credible.  (5 R.T. 1180).  "[T]he propriety of the

prosecutor's remarks must be judged in relation to what

would constitute a fair response to the remarks of defense

counsel."  <u>United States v. Lopez Alvarez</u>, 970 F.2d 583, 597

(9th Cir.), <u>cert</u>. <u>denied</u>, 506 U.S. 989 (1992).

     To the extent petitioner relies on this argument by the

prosecutor to claim the prosecutor shifted the burden of

proof, as noted, the prosecutor's closing argument stated

the prosecutor had the burden of proof (5 R.T. 1064, 1085),

and the jury instructions on burden of proof cured any

prejudice.  <u>United States v. Fleishman</u>, 684 F.2d at 1344.

     Claim A(2)(c) is without merit.

D.   <u>Claim A(3)(a)</u>

     Claim A(3)(a) alleges that the trial court removed from

44

1   the jury's consideration an element of the special

2   circumstance allegation that the victim was a peace officer

3   killed in the performance of his duties.  (Crctd. Pet., at

4   9).  Petitioner argues in his memorandum of points and

5   authorities accompanying the petition that the California

6   Supreme Court violated ex post facto principles when it

7   upheld the trial court's removal from the jury of the issue

8   whether the warrant Officer Williams was serving was valid.

9   (Crctd. Ps&As, at 117-22).  Petitioner raised the state

10  court analogue to claim A(3)(a) on direct appeal.  (Petition

11  for Rehearing, filed Dec. 18, 1990, at 35-36 [Lodged Doc. #

12  B23]; see also Supplemental Brief Addressing the Appeal,

13  filed May 16, 1990, at 14-20 [Lodged Doc. # B17] (addressing

14  the decision not to allow the jury to decide the

15  "performance of duties" issue)).

16

17      In its September 25, 2001 order, the Court granted

18  summary adjudication to respondent on that portion of claim

19  A3(a) involving whether the jury instructions left it to the

20  jury to decide if Deputy Williams and the other police

21  officers who executed the search warrant announced their

22  identity and purpose.  (Sept. 25, 2001 Order, supra, at 34).

23

24      The Court denied summary adjudication on that part of

25  claim A3(a) which alleges the California Supreme Court's

26  ruling that the validity of the warrant is not an element of

27  the special circumstance was an unforeseeable judicial

28  enlargement of Cal. Pen. Code § 190.2(a)(7).  (Sept. 25,

45

2001 Order, at 34-36).  The Court noted the potential error was not harmless because petitioner presented evidence the search warrant was defective.  (<u>Id</u>., at 37).

The Court has issued a tentative ruling in favor of respondent on the claim and has ruled that AEDPA applies to this case.  (Feb. 5, 2003 Tentative M&O, <u>supra</u>; Jun. 18, 2003 Ruling, <u>supra</u>).  Respondent now urges the Court to adopt its tentative ruling.  (Rsp's. Suppl. Br., at 9).

1.  <u>Absence of "Clearly Established" Supreme Court Authority.</u>

Application of AEDPA to this case greatly simplifies the Court's task.  Under federal law clearly established at the time petitioner's conviction became final, "[a]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the federal due process right to fair warning of what constitutes criminal conduct." <u>Clark v. Brown</u>, 450 F.3d 898, 911 (9th Cir.) (<u>citing</u> <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 353 (1964)), <u>cert</u>. <u>denied sub nom</u>. <u>Ayers v. Clark</u>, __ U.S. __, 127 S. Ct. 555 (2006). Under <u>Bouie</u> and subsequent cases, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial

46

decision has fairly disclosed to be within its scope."[21]
United States v. Lanier, 520 U.S. 259, 266 (1997).    The
"touchstone is whether the statute, either standing alone or
as construed, made it reasonably clear at the relevant time
that the defendant's conduct was criminal." Lanier, 520
U.S. at 267.  Novel state court constructions of criminal
statutes that are "indefensible by reference to the law
which had been expressed prior to the conduct in issue,"
Bouie, 378 U.S. at 354, are prohibited, but courts may
provide "clarity . . . by judicial gloss on an otherwise
uncertain statute" without violating the Due Process Clause
requirement of fair notice as to what conduct constitutes a
particular crime.  Lanier, 520 U.S. at 266.

Similarly, "judicial alteration of a common law
doctrine of criminal law violates the principle of fair

---

[21]  Bouie involved two African American college students who
sat at a drug store lunch counter and refused to leave when
asked because no signs indicated the lunch counter would not
serve African Americans.  378 U.S. at 348.  The state
criminal trespass statute under which they were convicted
prohibited only "entry upon the lands of another . . . after
notice from the owner . . . after notice from the owner or
tenant prohibiting such entry . . .," but, in affirming
their convictions, the South Carolina Supreme Court
construed the statute also to cover the act of remaining on
the premises of another after receiving notice to leave.
Id., at 349-50 & n.1 (quoting S. C. Code § 16-386 (1960 Cum.
Supp.)).  The United States Supreme Court ruled that the
South Carolina Supreme Court's interpretation of the statute
violated petitioners' due process right to "fair warning
that the conduct for which they have now been convicted had
been made a crime," 378 U.S. at 349, because "an
unforeseeable judicial enlargement of a criminal statute,
applied retroactively, operates precisely like an ex post
facto law, such as Art. I, § 10, of the Constitution
forbids."  378 U.S. at 353.

1  warning, and hence must not be given retroactive effect,

2  only where it is unexpected and indefensible by reference to

3  the law which had been expressed prior to the conduct in

4  issue." Rogers v. Tennessee, 532 U.S. 451, 462 (2001)

5  (internal quotes omitted).  See Robertson v. Runnals, 2008

6  WL 60288, at *22 (N.D. Cal. 2008) (summarizing the law).

7

8      In Poland v. Stewart, 117 F.3d 1094, 1099-1101 (9th

9  Cir. 1997), cert. denied, 523 U.S. 1082 (1998), and LaGrand

10 v. Stewart, 133 F.3d 1253, 1260-61 (9th Cir.), cert. denied,

11 525 U.S. 971 (1998), the Ninth Circuit applied the Bouie

12 principle to "the retroactive effect of decisions construing

13 aggravating factors for imposition of the death penalty."[22]

14 In Webster v. Woodford, 369 F.3d 1062 (9th Cir.), cert.

15 denied sub nom. Webster v. Brown, 543 U.S. 1007 (2004), the

16 Ninth Circuit stated:

17

18     Although Bouie does not apply to sentencing

19     schemes, it was well-established at the time

20     Webster's state conviction became final in 1992

21     that Bouie does apply to judicial constructions of

22     substantive elements of criminal law such as

23     aggravating circumstances.  . . . California's

24  _____

25 [22]   In non-capital cases, "Bouie applie[s] only to
26 after-the-fact increases in the scope of criminal liability
   and not to retroactive sentence enhancements." Holgerson v.
27 Knowles, 309 F.3d 1200, 1202 (9th Cir.2002) (citing United
   States v. Newman, 203 F.3d 700, 703 (9th Cir.), cert.
28 denied, 531 U.S. 866 (2000)), cert. denied, 538 U.S. 1005
   (2003).

1      special circumstances statute unarguably defines

2      the unique elements of capital murder that

3      distinguish it from other first degree murder, in

4      conformance with <u>Furman</u>.  It is not a mere

5      sentencing scheme, and therefore, application of

6      <u>Bouie</u> to the statute was clearly required as of

7      1992.  Indeed, California has long applied <u>Bouie</u> to

8      its special circumstances statute, and did so in

9      this very case.

10

11 <u>Id.</u> at 1069.  Similarly, in <u>Clark v. Brown</u>, <u>supra</u>, the Ninth

12 Circuit, relying on <u>Webster</u>, held that application in that

13 case of the California Supreme Court's interpretation of the

14 arson felony-murder special circumstance statute in <u>People</u>

15 <u>v. Green</u>, 27 Cal.3d 1 (1980), violated Clark's due process

16 right to fair warning that his conduct made him death

17 eligible.  450 F.3d at 909-16.  The court stated:

18

19      A new judicial interpretation of a special

20      circumstance provision can be challenged under

21      <u>Bouie</u> because '[s]pecial circumstances that make a

22      criminal defendant eligible for the death penalty

23      operate as "the functional equivalent of an element

24      of a greater offense."'

25

26 <u>Id.</u> at 911 (<u>quoting</u> <u>Webster</u>, 369 F.3d at 1068 and <u>Ring v.</u>

27 <u>Arizona</u>, 536 U.S. 584, 609 (2002)).

28

49

1    The Webster and Clark habeas petitions were filed

2    before AEDPA's effective date and did not involve its

3    deferential standard of review.   See Webster, 369 F.3d at

4    1066; Clark, 450 F.3d at 904.   The rule that "[s]pecial

5    circumstances that make a criminal defendant eligible for

6    the death penalty operate as 'the functional equivalent of

7    an element of a greater offense,'" Clark, 450 F.3d at 911

8    (quoting Ring, supra, 536 U.S. at 609), did not become

9    "clearly established federal law, as determined by the

10   Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),

11   until 2002.   Compare Ring, 536 U.S. at 609 (an aggravating

12   circumstance under Arizona law is "the functional equivalent

13   of an element of a greater offense") with Walton v. Arizona,

14   497 U.S. 639, 648 (1990) ("[W]e cannot conclude that a State

15   is required to denominate aggravating circumstances

16   'elements' of the offense or permit only a jury to determine

17   the existence of such circumstances.").   Although the

18   California Supreme Court was free to decide how to interpret

19   and apply Bouie to petitioner's case, this Court cannot say,

20   given then current federal constitutional law as explicated

21   in Walton, that how the state court did, or did not, do so

22   was contrary to, or an unreasonable application of, federal

23   law as determined by the United States Supreme Court.   Cf.

24   Danforth v. Minnesota, __ U.S. __, __, 128 S. Ct. 1029, 1038

25   (2008) ("Neither Linkletter nor Teague explicitly or

26   implicitly constrained the authority of the States to

27   provide remedies for a broader range of constitutional

28   violations than are redressable on federal habeas.").

1        Thus, at both time of trial and the California

2   Supreme Court's decision, there was no clearly established

3   Supreme Court authority invalidating either court's failure

4   to require a valid warrant as an element of the jury's

5   finding of special circumstances.

6

7        2.   The Merits of Petitioner's Bouie Argument

8

9        Assuming that, as when petitioner's conviction became

10  final in the present case on October 7, 1991, clearly

11  established federal law required that the California Supreme

12  Court apply Bouie-Rogers retroactivity principles to

13  petitioner's case, Duhaime v. Ducharme, supra, 200 F.3d at

14  600, petitioner's federal habeas claim still fails.  As

15  discussed below, in view of the evolving scope of the Fourth

16  Amendment concerning the exclusionary rule and its emerging

17  good faith exception, the California Supreme Court's ruling

18  was foreseeable, Bouie v. City of Columbia, 378 U.S. at 353-

19  54, and certainly was not "unexpected and indefensible by

20  reference to the law which had been expressed prior to the

21  conduct in issue," Rogers v. Tennessee, 532 U.S. at 462.

22

23       "The beginning point for a Bouie analysis is the

24  statutory language at issue, its legislative history, and

25  judicial constructions of the statute." Webster, 369 F.3d

26  at 1069.  A court may also examine the trend of judicial

27  constructions of similar statutes in other jurisdictions.

28  Id. at 1070.  To evaluate petitioner's claim, the Court must

examine the legal landscape as of May 29, 1979, the date of
petitioner's crime.[23]   See Clark, 450 F.3d at 912 ("Because
the Bouie analysis focuses on notice to the defendant, we
look only to cases decided before the crime was
committed."); People v. Gonzalez, 51 Cal. 3d at 1199.

The fact that the present case involves "specific
California statutes, with a long history of California
judicial construction and few, if any, specific statutory
counterparts in other jurisdictions" militates in favor of
"confin[ing] [the Court's] examination to California law."
Webster, 369 F.3d at 1070.  However, in construing the peace
officer special circumstance, the California Supreme Court
specifically relied on federal authority.[24]   See, e.g.,

_____

[23]   When a state court adjudicates the merits of an issue
without providing its underlying reasoning, as it did here,
the federal court conducts an independent review of the
record to determine whether the state court's resolution of
the issue constituted an objectively unreasonable
application of clearly established federal law.  Greene v.
Lambert, 288 F.3d 1081, 1088-89 (9th Cir. 2002); Himes v.
Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

        In this situation, the district court must conduct
        an independent review of the record; if after such
        review, it concludes that controlling Supreme Court
        law, unless applied in an unreasonable manner,
        would preclude the result reached by the state
        courts, it must grant relief to the petitioner.

Reynoso v. Giurbino, 462 F.3d 1099, 1119 (9th Cir. Sept. 6,
2006) (No. 05-55695).

[24]   Indeed, in arguing in support of the trial judge's
decision not to allow the jury to decide the "performance of
duties" issue, respondent specifically cited Leon and its
good faith exception to the exclusionary rule.  (See
Response to Appellant's Supplemental Brief Addressing the
Appeal, filed Jun. 22, 1990, at 8 n.5 [Lodged Doc. # B18]).

1  <u>People v. Gonzales</u>, 51 Cal. 3d at 1222 (<u>citing</u> <u>United States</u>

2  <u>v. Leon</u>, 468 U.S. 897, 915-921 (1984)).   Therefore, in

3  assessing the reasonableness of the California Supreme

4  Court's rejection of petitioner's <u>Bouie</u> claim, the Court

5  will look to California and federal law.

6

7      Respondent contends that the language of the statute,

8  standing alone, was enough to give petitioner fair warning

9  that his killing of Deputy Williams might subject him to the

10  death penalty.[25]  (Rsp's. Op. Br., at 7).   However, as

11  petitioner points out (Ptr's. Opp. on A(3)(a), at 9), the

12  phrase "performance of . . . duties" had received a judicial

13  interpretation by the time petitioner committed his crime

14  under which a Fourth Amendment violation was a defense to

15  criminal liability based on an officer's performance of

16  duties.[26]  In petitioner's case, the state court modified the

17  ─────────────────

18  [25]   At the time of the crime, Cal. Pen. Code § 187(a)
    outlawed "the unlawful killing of a human being . . . with
19  malice aforethought."   Cal. Pen. Code § 189 stated, in
    relevant part, "any . . . willful, deliberate, and
20  premeditated killing . . . is murder of the first degree."
    Cal. Pen. Code § 190.2(a), stated, in relevant part, "[t]he
21  penalty for a defendant who is found guilty of murder in the
    first degree is death or imprisonment in the state prison
22  for life without the possibility of parole if one or more of
    the following special circumstances has been found . . .
23  true: . . . (7) the victim was a peace officer, . . . who,
    while engaged in the course of the performance of his or her
24  duties, was intentionally killed, and the defendant knew, or
    reasonably should have known, that the victim was a peace
25  officer engaged in the performance of his or her duties."

26  [26]   Ten years prior to the crime, in <u>People v. Curtis</u>, 70
    Cal. 2d 347 (1969), the California Supreme Court reversed a
27  conviction of battery on a police officer, because the
    warrantless arrest of the defendant lacked probable cause.
28  In <u>People v. Henderson</u>, 58 Cal. App. 3d 349, 357-58 (1976),
    the defendant prevailed on a similar claim that the officer

1 common-law-derived  definition of "'engaged in . . .

2 duties,'" incorporated into previous statutory

3 interpretation, to "include the correct service of a

4 facially valid search or arrest warrant, regardless of the

5 legal sufficiency of the facts shown in support of the

6 warrant."  51 Cal. 3d at 1222.  Under <u>Bouie</u> and <u>Rogers</u>,

7 therefore, this "judicial alteration of a common law

8 doctrine of criminal law violates the principle of fair

9 warning, and hence must not be given retroactive effect,

10 . . . where it is unexpected and indefensible by reference

11 to the law which had been expressed prior to the conduct in

12 issue."  <u>Rogers</u>, <u>supra</u>, 532 U.S. at 462.

13

14      In rejecting petitioner's argument that the jury should

15 have decided the issue of whether Deputy Williams was

16 engaged in duties when petitioner killed him, the California

17 Supreme Court extensively discussed the state of the law as

18 of the time of its decision.  <u>People v. Gonzalez</u>, 51 Cal. 3d

19 ─────────────────

20 he attacked was not engaged in the lawful performance of his
   duties because the warrant's discrepancy with knock and

21 notice requirements rendered it invalid.  Similarly, in
   <u>People v. Muniz</u>, 4 Cal. App. 3d 562, 567-69 (1970), the

22 court reiterated the principle in <u>Curtis</u>.  As the Court of
   Appeal stated in <u>People v. Soto</u>, 276 Cal. App. 2d 81 (1969):

23      "[W]hether the peace officer was actually engaged

24      in the performance of his duties is not an
        evidentiary question or a question of law to be

25      resolved by the trial judge.  Rather, it is a
        question of fact and an essential part of the

26      corpus delicti itself."

27 <u>Id</u>. at 86-87.  <u>See also People v. Gonzalez</u>, <u>supra</u>, 51
   Cal. 3d at 1263-64 (Mosk, J., concurring and dissenting)

28 (stating that the Curtis rule was "firmly established" at
   the time of petitioner's crime).

at 1217-22.  The California Supreme Court's discussion of
these precedents makes it clear that an interpretation of
the phrase, "'performance of . . . duties,'" **Id.** at 1219
(quoting Cal. Pen. Code § 190.3(7)), which focuses on the
officer's duty to serve a facially valid warrant, rather
than on the technical issue of whether the warrant was in
fact legally valid, was an issue of first impression, not a
"radical and unforeseen departure from former law." Hayes
v. Woodford, 301 F.3d at 1088; see People v. Gonzalez, 51
Cal. 3d at 1218 (stating that the court was "[s]quarely
faced with the issue for the first time").

Furthermore, the California Supreme Court's
construction of this phrase, in the context of an officer's
duty to serve a facially valid search warrant, is a logical
and foreseeable extension of the development under federal
law of the good faith exception to the exclusionary rule in
Fourth Amendment cases.  Starting in the 1970's commentators
began to discuss a good faith exception to the exclusionary
rule the Court had fashioned for Fourth Amendment violations
in federal courts in Weeks v. United States, 232 U.S. 383
(1914), and extended to the states in Mapp v. Ohio, 367 U.S.
643 (1961).[27]  By May of 1979, the United States Supreme

---

[27]   See, e.g., Bernardi, The Exclusionary Rule: Is a Good
Faith Standard Needed to Preserve a Liberal Interpretation
of the Fourth Amendment?, 30 De Paul L. Rev. 51 (1980);
Note, Reason and the Fourth Amendment--The Burger Court and
The Exclusionary Rule, 46 Fordham L. Rev. 139 (1977);
Friendly, The Bill of Rights as a Code of Criminal
Procedure, 53 Cal. L. Rev. 929 (1965); see also H. Friendly,
Benchmarks 260-262 (1967) (exclusion should be limited to

Court had started to articulate the basis for the good faith
exception which it later adopted in United States v. Leon,
468 U.S. 897, 907-08 (1984).

     Then Chief Justice Burger, dissenting in Bivens v. Six
Unknown Named Agents, 403 U.S. 388 (1971), stated that the
pressures on police to prevent crime result in "'inadvertent
errors of judgment"' and expressed concern that the
exclusionary rule treats honest mistakes and flagrant Fourth
Amendment violations equally.  403 U.S. at 418.  This
criticism is the heart of the justification for a good faith
exception.  Note, The Emerging Good Faith Exception to the
Exclusionary Rule, 57 Notre Dame Law. 112, 119 n.60 (1981).

     In Michigan v. Tucker, 417 U.S. 433 (1974), a Fifth
Amendment case where the police conduct in question pre-
dated Miranda v. Arizona, 384 U.S. 436 (1966), police
officers questioned the defendant after giving him all but
one of the Miranda warnings, the defendant's statement led
to his conviction, and the defendant sought post-Miranda
habeas relief.  The Court denied relief and declared that
technical police error did not require exclusion of evidence
under the Fifth Amendment unless exclusion served the rule's
deterrence rationale.  417 U.S. at 447.  Because the police
officers in Tucker acted in good faith and without knowledge
of the subsequent Miranda decision, excluding the evidence

---

"the fruit of activity intentionally or flagrantly
illegal").

1  would not achieve deterrence and was unwarranted.  Id.

2

3      In United States v. Peltier, 422 U.S. 531 (1975), a

4  case involving a border search that pre-dated, and did not

5  comply with, the Court's decision in United States v.

6  Almeida-Sanchez, 413 U.S. 266 (1973), the Court refused to

7  apply Almeida-Sanchez retroactively because to do so would

8  not serve the exclusionary rule's rationales.[28]  422 U.S. at

9  542.  Relying on Tucker, the Court stated that the exclusion

10  of evidence would not deter improper police action taken in

11  good faith reliance on current standards and that,

12  therefore, the evidence should be admitted, even though the

13  police violated defendant's Fourth Amendment rights.  Id.

14

15      In Brown v. Illinois, 422 U.S. 590 (1975), Justice

16  Powell, concurring in the Court's decision, differentiated

17  between various Fourth Amendment violations, stating that

18  the degree of attenuation necessary to remove the taint of

19  such a violation should be greater when a "flagrantly

20  abusive violation of Fourth Amendment rights" occurs, and

21  less when a "technical" Fourth Amendment violation occurs.

22  Id. at 610-11 (Powell, J. Concurring).  Justice Powell noted

23  that the exclusion of illegally-seized evidence would not

24  serve the exclusionary rule's deterrence rationale where the

25  Fourth Amendment violation was merely "technical" and that

26

27  [28]   In Almeida-Sanchez, the Court held that the Fourth
    Amendment's probable cause requirement applied to the Border
28  Patrol's roving warrantless search of a car more 25 miles
    from the border with Mexico.  413 U.S. at 273-75.

57

in such cases, "no legitimate justification for depriving
the prosecution of reliable and probative evidence" exists.
**Id.** at 612 (Powell, J., concurring).

In <u>United States v. Janis</u>, 428 U.S. 433 (1976), the
Court held that evidence seized by a state police officer in
good faith reliance on a warrant a court later declares
defective is admissible in a federal tax proceeding.  Since
the illegally seized evidence was inadmissible in state and
federal criminal trials, any additional deterrence from
excluding the evidence in a civil proceeding is marginal and
"does not outweigh the cost to society" of excluding
reliable evidence.  <u>Id</u>. at 453-54.  The Court noted the
officer's good faith, "a factor that . . . reduces
significantly the potential deterrent effect of exclusion."
<u>Id</u>. at 458-59 n.35.

In <u>Stone v. Powell</u>, 428 U.S. 465, 486 (1976), in
holding that habeas petitioners who have had a full and fair
opportunity to litigate their Fourth Amendment claims in
state court may not re-litigate them in federal court, the
Court noted that the Fourth Amendment "has never been
interpreted to proscribe the introduction of illegally
seized evidence in all proceedings or against all persons"
and that "[t]he primary justification for the exclusionary
rule . . . is the deterrence of police conduct that violates
Fourth Amendment rights."  428 U.S. at 485.  In dissent,
Justice White said a good faith exception was warranted:

"When law enforcement personnel have acted mistakenly, but in good faith and on reasonable grounds, and yet the evidence they have seized is later excluded, the exclusion can have no deterrent effect.  The officers, if they do their duty, will act in similar fashion in similar circumstances in the future . . .." Id., at 540 (White, J., dissenting).

Thus, by 1976, four United States Supreme Court Justices had expressed a desire to incorporate a good faith exception into the Fourth Amendment exclusionary rule.[29] Stone, 428 U.S. at 501 (Burger, C.J., concurring); id., at 538 (White, J., dissenting); Brown, 422 U.S. 590, 610-12 (1975) (Powell, J., concurring); Peltier, 422 U.S. 531, 537-39 (1975) (Rehnquist, J.).

In sum, by the time petitioner killed Deputy Williams, the evolution under federal law of the good faith exception to the exclusionary rule in Fourth Amendment cases was

_____

[29]   Lower court decisions also foreshadowed the good faith exception.  See, e.g., United States v. Kilgen, 445 F.2d 287, 289 (5th Cir. 1971) ("There is no hint of any abusive police conduct in effecting the [defendant's] arrest or in obtaining the evidence used at the trial for another crime;" the police, "with the utmost regard for the rights of the defendant, carried out their sworn duty to make an arrest and obtain evidence under the law as it then existed.  No legitimate interest would be served by excluding the confession to the separate crime of stealing postage stamps because we now find the vagrancy ordinance invalid."); Wiley v. Daggett, 551 F.2d 776, 779 (8th Cir. 1977) (confession obtained after defendant's arrest under unconstitutional ordinance admissible; "[T]he good faith of the officers was an adequate basis for the ruling"), cert. denied, 434 U.S. 844 (1977).

1   already well under way.  Given the evolving scope of the

2   exclusionary rule and its emerging good faith exception, in

3   May of 1979, it was foreseeable, <u>Bouie v. City of Columbia</u>,

4   378 U.S. at 353-54, and it certainly was not "unexpected and

5   indefensible by reference to the law which had been

6   expressed prior to the conduct in issue," <u>Rogers v.</u>

7   <u>Tennessee</u>, 532 U.S. at 462, that the California state courts

8   might create an analogous "good faith exception" under Cal.

9   Pen. Code § 190.2(a)(7) by ruling that, when a police

10  officer is killed while serving a facially valid search

11  warrant, the actual validity of the warrant is not an

12  element of the special circumstance.[30]

14      Assuming petitioner is entitled to the application of

15  clearly established Supreme Court authority which

16  crystallized more than a decade later, the California

17  Supreme Court's rejection of the state court analogue to

18  claim A(3)(a) is not contrary to, or an unreasonable

19  application of, federal law as determined by the United

20  States Supreme Court, and it is not based on an unreasonable

21  determination of the facts in light of the evidence before

22  the state courts.  28 U.S.C. §§ 2254(d)(1) & (2).  Claim

23  A(3)(a) is without merit.

26  [30]   Because the California Supreme Court's ruling that the
27  actual validity of the warrant was not an element of Cal.
    Pen. Code § 190.2(a)(7) survives review under AEDPA, the
28  Court need not address petitioner's arguments concerning the
    warrant's validity.

1    E.    Claim A(3)(b)

2

3         In claim A(3)(b), petitioner alleges that "[t]he trial

4    court instructed the jury regarding a special circumstance

5    allegation under an overbroad standard." (Crctd. Pet., at

6    9).  In his memorandum of points and authorities, petitioner

7    contends the Cal. Pen. Code § 190.2(a)(7) peace officer

8    special circumstance fails to "narrow the scope of murders

9    eligible for the death penalty," Webster v. Woodford, 369

10   F.3d at 1068 n.2 (citing Furman v. Georgia, 408 U.S. 238

11   (1972)), in that it does not provide a "meaningful basis for

12   distinguishing the few cases in which [a death sentence] is

13   imposed from the many cases in which it is not," Furman v.

14   Georgia, 408 U.S. at 313 (White, J., concurring), and it

15   fails to "channel the sentencer's discretion by 'clear and

16   objective standards' that provide 'specific and detailed

17   guidance,' and that 'make rationally reviewable the process

18   for imposing a sentence of death.'" Godfrey v. Georgia, 446

19   U.S. 420, 428 (1980). (Crctd. Ps&As., at 124-26).  Noting

20   that the special circumstance encompasses those murderers

21   who "knew" and those who "should have known" the victim was

22   a police officer engaged in the performance of duties,

23   petitioner contends extending the statute "to encompass

24   . . . constructive knowledge was impermissibly broad . . .."

25   (Crctd. Ps&As., at 126).

26

27        The special circumstance states:

28

                              61

1          The victim was a peace officer, as defined in

2          [California Penal Code] Section

3          830.1,830.2,830.3,830.31,830.35, 830.36, 830.4,

4          830.5, 830.5a, 830.6, 830.10, 830.11, or 830.12,

5          who, while engaged in the course of the performance

6          of his duties was intentionally killed and the

7          defendant knew or reasonably should have known that

8          the victim was a peace officer engaged in the

9          performance of his duties; or the victim was a

10         peace officer as defined in the above enumerated

11         sections of the Penal Code, or a former peace

12         officer under any of such sections, and was

13         intentionally killed in retaliation for the

14         performance of his official duties.

15   Cal. Pen. Code § 190.2(a)(7).

16

17        In rejecting petitioner's claim on the merits, the

18   California Supreme Court stated:

19         The special circumstance of peace-officer murder

20         requires that defendant intentionally killed a

21         person he 'knew or should have known was a peace

22         officer engaged in the performance of duties.'

23         Defendant asserts that a standard of mere

24         constructive-knowledge violates the Eighth and

25         Fourteenth Amendments because it is vague and

26         overbroad, and because it fails to draw a rational

27         distinction, based on relative culpability, between

28         intentional murderers who are and are not eligible

1     for the death penalty.  We have previously upheld

2     the constructive-knowledge standard of the

3     peace-officer special circumstance against a

4     similar challenge.  We do so here.

5

6  People v. Gonzalez, 51 Cal. 3d at 1124 (citations omitted);

7  see also People v. Rodriquez, 42 Cal. 3d 730, 779-82 (1986)

8  (explaining the State court's rationale for upholding Cal.

9  Pen. Code § 190.2(a)(7) against constitutional challenges

10  similar to those petitioner raises here).

11

12     In Jackson v. Calderon, 1997 WL 855516 (C.D. Cal.

13  1997), rev'd. in part on other grounds, 211 F.3d 1148 (9th

14  Cir. 2000), cert. denied sub nom. Woodford v. Jackson, 531

15  U.S. 1072 (2001), the petitioner made a claim almost

16  identical to the claim petitioner is raising here.  There,

17  the Court found, the jury had determined that the

18  petitioner, Jackson, both knew and should have known that

19  his victim was a police officer, a finding not made here.

20  1997 WL 855516, at *74.  However, the Court also addressed

21  the claim petitioner is raising and, in so doing, summarized

22  the relevant United States Supreme Court authority:

23

24     Even if the jury had not specifically found that

25     Jackson knew Wrede was a peace officer, his claim

26     would fail on the merits.  First, the Supreme Court

27     has found that 'the fact that the murder victim was

28     a peace officer performing his regular duties may

be regarded as an aggravating circumstance.  There
is a special interest in affording protection to
these public servants who regularly must risk their
lives in order to guard the safety of other persons
and property.'  [citation to Roberts v. Louisiana,
431 U.S. 633, 636 (1977)].  Jackson relies upon
Zant v. Stephens, [462 U.S. 862, 877 (1983),] for
the proposition that the state's statutory
framework for the imposition of the death penalty
must 'reasonably justify the imposition of a more
severe sentence on the defendant compared to others
found guilty of murder.'  Nevertheless, when
discussing the desirability of limiting the death
penalty to particular crimes, the Stephens court
itself acknowledged its own holding that the murder
of a peace officer may be considered as an
aggravating circumstance due to the '"special
interest in affording protection to those public
servants who regularly must risk their lives
. . ."'  [citation to Zant, 462 U.S. at 877 n.15
and Roberts, 431 U.S. at 636]

Second, and even more importantly, the Supreme
Court has examined and upheld the general facial
validity of California's 1977 statutory scheme
governing the death penalty, which included the
peace-officer special circumstance that is at issue
in this case.  [citation to Pulley v. Harris, 465
U.S. 37, 53 (1984) and California v. Brown, 479

64

U.S. 538, 540 (1987)].  The Court notes that the
provision herein at issue [under the 1978 Death
Penalty law], was substantially identical to the
provision set forth in the 1977 statute. . . .

Jackson, 1997 WL 855516, at *74.

Thus, federal constitutional law as determined by the
United States Supreme Court, clearly established at the time
petitioner's conviction became final in 1991, forecloses
petitioner's argument that the police officer murder special
circumstance fails to narrow the scope of murders eligible
for the death penalty within the meaning of Furman, supra.

Petitioner's claim therefore boils down to the argument
that the meaning of "reasonably should have known" was vague
and ambiguous, allowing each juror to apply his or her own
concept of what is reasonable, introducing into the
deliberative process the arbitrariness and uncertainty the
Court condemned in Furman, supra, and other cases.  This
argument makes sense only if the average juror is unable to
ascertain and apply the meaning of "reasonably should have
known" in the instruction reiterating the statutory
language.  See Rodriguez, supra, 42 Cal. 3d at 781-82
(rejecting this contention).

"The mere fact that a penal statute is so framed as to
require a jury upon occasion to determine a question of

65

1  reasonableness is not sufficient to make it too vague to

2  afford a practical guide to permissible conduct." United

3  States v. Ragen, 314 U.S. 513, 523 (1942); see United States

4  v. Escobar, 1987 WL 31141, at *7 (S.D. Cal. 1987) (listing

5  cases in which "the Supreme Court has upheld statutes that

6  require a jury to determine whether a defendant's conduct

7  was reasonable").  There is no reasonable likelihood that

8  the jury has applied the challenged instruction in an

9  arbitrary manner, Boyde v. California, 494 U.S. 370, 380

10  (1990), particularly here, where defense counsel focused his

11  arguments on the contention petitioner "thought it was the

12  Bassett gang" when he shot Deputy Williams.[31]  (5 R.T. 1129).

14      Claim A(3)(b) is without merit.

16  F.   Claim A(3)(c)

18      In claim A(3)(c), petitioner alleges that the trial

19  court violated the federal constitution when it failed sua

20  sponte to give a specific cautionary instruction that the

21  testimony of informants such as William Acker must be viewed

---

23  [31]   (See also 5 R.T. 1092 ("that is the whole case, what, in

24  fact, is in [petitioner's] mind and what should be in
    [petitioner's] mind . . .."), 1105 (defense contention is

25  "that if [petitioner] knew they were police officers . . .
    that he would not have shot one of the police officers."),

26  1119 (And the defense of my client is very, very simple,
    simply that he thought a gang was after him, and he killed a

27  Sheriff's deputy in self-defense."), 1122 (theory that
    petitioner planned "to get himself a Sheriff's deputy" was

28  not credible), 1130 ("There's reasonable doubt that he
    didn't know it was the police")).

with suspicion and distrust, and is inherently unreliable. (Crctd. Pet., at 10; Crctd. Ps&As., at 122-23).

Although in the Ninth Circuit the failure to give <u>sua sponte</u> a special cautionary instruction regarding the credibility of a criminal informant constitutes reversible error when the informant's testimony is "important," <u>see United States v. Patterson</u>, 648 F.2d 625, 631 (9th Cir. 1981); <u>People of the Territory of Guam v. Dela Rosa</u>, 644 F.2d 1257, 1259-60 (9th Cir. 1980), as the California Supreme Court pointed out in petitioner's case on direct appeal, <u>People v. Gonzalez</u>, 51 Cal. 3d at 1210, California has no such requirement.  <u>See</u> <u>People v. Hovey</u>, 44 Cal. 3d 543, 565-66, <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>. <u>Hovey v. California</u>, 488 U.S. 871 (1988); <u>People v. Alcala</u>, 36 Cal. 3d 604, 623-24 (1984) (<u>citing</u> Cal. Evid. Code § 411).

As these authorities would suggest, under clearly established federal law as determined by the United States Supreme Court, the federal constitution does not require that a trial court specifically instruct a jury to weigh an informant's testimony with care, and the trial court's failure to do so does not entitle a petitioner to relief under Section 2254; petitioner will be entitled to habeas relief on this claim only if the trial court's refusal to give the instruction resulted in a fundamentally unfair trial.  <u>See</u> <u>Smith v. Gibson</u>, 197 F.3d 454, 460 (10th Cir. 1999), <u>cert</u>. <u>denied</u>, 531 U.S. 839 (2000) (pre-AEDPA case;

"Because petitioner has failed to assert a recognized
federal constitutional right to a cautionary jury
instruction regarding an informant's testimony, he will be
entitled to habeas relief on this claim only if the trial
court's refusal to give the instruction resulted in a
fundamentally unfair trial."); Edelbacher v. Galaza, 2007 WL
677222, at *13 (E.D. Cal. Mar. 1, 2007) (report and
recommendation of Magistrate Judge rejecting claim identical
to petitioner's under AEDPA), report and recommendation
adopted, 2007 WL 1609874 (E.D. Cal. Jun 04, 2007); accord,
Bonin v. Vasquez, 807 F. Supp. 589, 617 (C.D. Cal. 1992) (A
trial court's failure to give an instruction sua sponte on
the unreliability of informant testimony is not necessarily
plain error requiring a reversal; "[t]he need for the
instruction must be analyzed in light of the circumstances
of the case.") (citations omitted), aff'd, 59 F.3d 815 (9th
Cir.1995), cert. denied, 516 U.S. 1051 (1996).


     Under clearly established federal law as determined by
the United States Supreme Court, to obtain federal habeas
corpus relief for error in the jury instructions in his
state criminal trial, petitioner must show that the error
rendered the trial so fundamentally unfair that the
resulting conviction violates due process.  See Henderson v.
Kibbe, 431 U.S. 145, 154 (1977); Cupp v. Naughten, 414 U.S.
141, 147 (1973).  "An omission, or an incomplete
instruction, is less likely to be prejudicial than a
misstatement of the law." Henderson, 431 U.S., at 155.

On direct appeal, the California Supreme Court made the following findings, which petitioner does not contest:

> The jurors knew Acker was a convicted murderer with a motive to cooperate.  They received standard instructions that they should consider a witness's bias or interest, that a witness false in part is to be distrusted, that the uncorroborated testimony of a single witness should be carefully evaluated, and that a defendant's oral admissions should be viewed with caution.  Discrepancies in informant Acker's testimony, and his possible motives for giving testimony favorable to the prosecution, were explored at some length in cross-examination and in argument.  The court's failure to give a further 'jailhouse informant' instruction sua sponte is not reversible error.

51 Cal. 3d at 1209-10 (citations omitted).  No federal constitutional violation occurred because, as the California Supreme Court found, petitioner's trial counsel, through cross-examination and argument, presented his theory that Acker, as an informant, had a motive to lie, was unreliable, and was to be distrusted.  Cf. Smith v. Gibson, 197 F.3d at 460 (No fundamental unfairness where "[d]efense counsel had ample opportunity to attack [informant's] credibility and was able to bring to the jury's attention the fact that [informant] was not a disinterested witness" and the trial

1    court instructed jurors that it was their job to determine a

2    witness's credibility, after considering "any bias,

3    prejudice or interest the witness might have in the outcome

4    of the trial.") (citation omitted); <u>Cook v. Pearlman</u>, 212

5    F. Supp. 2d 258, 265 (S.D.N.Y. 2002) (trial court's failure

6    to give an interested witness jury instruction did not

7    violate due process where "[t]he trial court's jury charge

8    permitted [petitioner] to '"effectively present[]" [his]

9    argument as to the value of the [witnesses'] testimony.'")

10   (citations omitted).

12        Claim A(3)(c) is without merit.

14   F.   <u>Claims B(2)(a) and B(3)(a)</u>

16        In claim B(2)(a), petitioner argues that the prosecutor

17   committed misconduct in penalty phase closing argument when

18   he told the jury not to consider sympathy for petitioner as

19   a mitigating factor in deciding whether to impose the death

20   penalty or life imprisonment.  (Crctd. Pet., at 11; Crctd.

21   Ps&As., at 78-81).  In claim B(3)(a), petitioner argues that

22   the trial court denied petitioner due process when it

23   allegedly ruled that the jury may not consider sympathy for

24   petitioner in deciding penalty.  (Crctd. Pet., at 12; Crctd.

25   Ps&As, at 126).  Because these claims involve the same

26   operative facts and raise the same fundamental issue of

27   whether petitioner's jury was denied the opportunity to

28   consider sympathy, the Court addresses them together.

In the penalty phase opening jury instructions, the
trial judge instructed:

> As jurors, you have two duties to perform.  One
> duty is to determine the facts of the case from the
> evidence received in the trial and not from any
> other source. . . . Your other duty is to apply the
> rules of law that I state to you to the facts as
> you determine them and in this way to arrive at
> your verdict.
> It is my duty in these instructions to explain to
> you the rules of law that apply to this case.  You
> must accept and follow the rules of law as I state
> them to you.
> <u>You must not be swayed by mere sentiment,
> conjecture, sympathy, passion, prejudice, public
> opinion, or public feeling</u>.  Both the People and
> the defendant have a right to expect that you will
> conscientiously consider and weigh the evidence and
> apply the law of the case, and that you will reach
> a just verdict regardless of what the consequences
> of such verdict may be.

(2 C.T. 362-63 (CALJIC 1.00); 21 R.T. 4660; R.T. Suppl. at
53 (jury instruction as read to the jury) (emphasis added)).

In his closing argument to petitioner's second penalty
phase jury, the prosecutor argued:

1    When you walk through that door, your next job is

2    going to be weighing the factors, weighing the

3    factors as to the weighing of them in order to

4    reach a verdict, but I think conceptually the

5    easiest way for me to explain that is that think of

6    yourselves as twelve cars on a train track.   You

7    are coming – you listen to the evidence.   You go

8    down the track, weighing the factors and you reach

9    a verdict; however, there are ways that you can be

10   sidetracked.

11   One car, two cars, get sidetracked.

12       *    *    *

13   Let me go to the other ones that may come up.

14   The one that there can be a derailment, which is

15   the emotional one.

16   His honor said that you are not supposed to

17   consider sympathy or compassion.   You are supposed

18   to weigh the facts that you heard from the witness

19   stand and the physical exhibits we are talking

20   about.

21   Those are evidence.   Sympathy for the defendant, if

22   you are a person who says, well, you know, I always

23   take the position of the underdog – the defendant's

24   the underdog in this case, therefore I am going to

25   be his advocate, I am going to stand up for the

26   defendant.

27   His honor read to you that none of you are

28   advocates, you are not an advocate for the

1    defendant, so, hopefully, no one will fit into the
2    emotional trap of saying, well, somebody should
3    speak up in behalf of the defendant.
4    The other, about families, you saw the defendant's
5    sister testify, and children in and out of the
6    court.  That's something that you are not to - to
7    weigh and consider, and should be put aside.  It
8    can - it can grab somebody, grab somebody on the
9    jury.  If you do that, you're not doing your job,
10   you're being distracted.  But, hopefully, we don't
11   get stuck with somebody down here.

13   (21 R.T. 4684-87 (emphasis added)).

15        The California Supreme Court rejected petitioner's
16   claim.  Applying Boyde v. California, 494 U.S. 370 (1990),
17   the state court noted that the statute and the instructions
18   given here include a "catch-all" factor which directs
19   consideration of "any . . . circumstance which extenuates
20   the gravity of the crime even though it is not a legal
21   excuse for the crime," People v. Gonzalez, 51 Cal. 3d at
22   1225 (quoting Cal. Pen. Code § 190.3; CALJIC, former No.
23   8.84.1, factor (k)), and, the court stated, "[u]nless
24   misled, a reasonable jury should understand that this
25   phraseology includes consideration of mitigating character
26   and background evidence introduced at trial."  **Id.** at 1225
27   (citing Boyde, 494 U.S. at 381-82).

28

                                   73

1    Continuing to rely on <u>Boyde</u>, the California Supreme

2    Court pointed out that the trial judge instructed the jury

3    to consider "all of the evidence," and the prosecutor never

4    suggested that evidence petitioner presented in mitigation

5    was irrelevant, so that there was no "reasonable likelihood"

6    that the jury misconstrued the relevant scope of such

7    evidence.  **Id.** at 1225 (<u>citing</u> <u>Boyde</u>, 494 U.S. at 380).  In

8    a footnote, the court stated:

9

10       <u>Boyde</u> expressly addressed the appropriate standard for

11       evaluating a federal constitutional claim that

12       ambiguous instructions impermissibly restricted the

13       jury's consideration of relevant mitigating evidence.

14       After reviewing various past expressions of the

15       standard, <u>Boyde</u> held that constitutional difficulties

16       arise only if 'there is a reasonable likelihood [i.e.,

17       more than a mere 'possibility'] that the jury has

18       applied the challenged instruction in a way that

19       prevents the consideration of constitutionally relevant

20       evidence . . . .'  We thus adopt the 'reasonable

21       likelihood' test for defendant's claims that the

22       ambiguous standard sentencing instruction and the 'no

23       sympathy' instruction, as exploited by the prosecutor,

24       prevented the jury from considering all relevant

25       evidence in mitigation.

26

27  **Id.** at 1225 n.23 (citation omitted).

28

74

1    Further, the California Supreme Court cited <u>California</u>
2  <u>v. Brown</u>, 479 U.S. 538 (1987), and stated that the trial
3  court's instruction against "mere sentiment, conjecture,
4  sympathy, passion, prejudice, public opinion or public
5  feeling" does not alter the analysis because, unless misled,
6  "a reasonable jury will understand that this instruction
7  does not foreclose compassionate evaluation of the
8  mitigating evidence, but warns only against 'factually
9  untethered' emotion, bias, or outside pressure." <u>Gonzalez</u>,
10  51 Cal. 3d at 1225 (<u>citing</u> <u>Brown</u>, 479 U.S. at 542-43;
11  emphasis in original deleted).

12

13    The California Supreme Court discussed the prosecutor's
14  statement that "His Honor said . . . you are not supposed to
15  consider sympathy or compassion." <u>Id.</u> at 1225-26.  Noting
16  that defense counsel raised no objection, the state court
17  stated that, "[i]n any event, the context of the remark
18  clearly indicates it was intended only to focus the jury on
19  the evidence, rather than on vague pity for persons forced
20  to defend against criminal charges," so that there was "no
21  reasonable likelihood that the jury misinterpreted the
22  standard 'antisympathy' instruction." <u>Id</u>.  Finally, the
23  court said the prosecutor did not mislead the jury with his
24  brief admonition, again "unchallenged by the defense," that
25  the jurors must not "weigh" or "consider" the presence of
26  defendant's family members in court. <u>Id</u>., 51 Cal. 3d at
27  1226 (footnote omitted).  "[T]he jury could properly be
28  cautioned against free-floating emotional responses that

were extraneous to the statutory sentencing factors and the
aggravating and mitigating evidence." Id., 51 Cal. 3d at
1226 (citing Brown, 479 U.S. at 542-43).

    Under federal law clearly established at the time
petitioner's conviction became final, in a capital case, a
capital sentencer must not be precluded from considering any
mitigating evidence relating to the defendant or the crime.
See, e.g., Eddings v. Oklahoma, 455 U.S. 104, 111-112
(1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality
opinion). Mitigating evidence at the penalty phase allows
sentencer to consider "compassionate . . . factors stemming
from the diverse frailties of humankind." Woodson v. North
Carolina, 428 U.S. 280, 304 (1976) (plurality opinion).

    In California v. Brown, supra, the Court upheld the
constitutionality of a jury instruction identical in
material respects to that used in petitioner's case. In
Brown, the trial judge instructed the jury, as the trial
judge did here, that it must not be swayed by "'mere
sentiment, conjecture, sympathy, passion, prejudice, public
opinion or public feeling.'" 479 U.S., at 542. In a 5-4
decision, the majority held that this instruction did not
violate the Eighth and Fourteenth Amendments for two
reasons. First, the word "mere" informed the jury "to
ignore only the sort of sympathy that would be totally
divorced from the evidence adduced during the penalty
phase." Id. at 542. "By concentrating on the noun

76

'sympathy,'" the defendant had "ignore[d] the crucial fact
that the jury was instructed to avoid basing its decision on
mere sympathy." Id., at 542.  Second, it was "highly
unlikely that any reasonable juror would almost perversely
single out the word 'sympathy' from the other nouns which
accompany it in the instruction: conjecture, passion,
prejudice, public opinion, or public feeling." Id., at
542-543.  "Reading the instruction as a whole," id., at 543,
a rational juror could only conclude that the instruction
was intended simply to confine the jury's deliberations to
issues arising from the evidence presented.

In a concurring opinion, Justice O'Connor, who provided
the fifth vote for the majority, concurred because the
instruction was consistent with the requirement that "the
individualized assessment of the appropriateness of the
death penalty [be] a moral inquiry into the culpability of
the defendant, and not an emotional response to the
mitigating evidence . . .." 479 U.S., at 545 (O'Connor, J.,
concurring).  However, Justice O'Connor added:

> On remand, the California Supreme Court should
> determine whether the jury instructions, taken as a
> whole, and considered in combination with the
> prosecutor's closing argument, adequately informed
> the jury of its responsibility to consider all of
> the mitigating evidence introduced by the
> respondent. . . . [I]n his closing remarks, the

1          prosecutor in this case may have suggested to the

2          jury that it must ignore the mitigating evidence

3          about the respondent's background and character. In

4          combination with the instructions, the comments of

5          the prosecutor may create a 'legitimate basis for

6          finding ambiguity concerning the factors actually

7          considered by the' jury. [cite omitted] [¶]

8          Because it is open to the California Supreme Court

9          to determine on remand whether the jury was

10         adequately informed of its obligation to consider

11         all of the mitigating evidence introduced by the

12         respondent, I concur in the judgment and opinion of

13         the Court.

14

15    Id., at 546.

16

17         In Boyde v. California, 494 U.S. 370 (1990), the Court

18    faced the question whether California's "catch-all"

19    mitigating factor, Cal. Pen. Code § 190.3, factor (k),

20    complied with the Eighth Amendment requirement "that the

21    jury be able to consider and give effect to all relevant

22    mitigating evidence offered by petitioner."  494 U.S. at

23    377-78.  In concluding that factor (k) does meet this

24    requirement, the Court stated:

25

26         In this case we are presented with a single jury

27         instruction.  The instruction is not concededly

28         erroneous, nor found so by a court . . .. The claim

78

is that the instruction is ambiguous and therefore
subject to an erroneous interpretation.  We think
the proper inquiry in such a case is whether there
is a reasonable likelihood that the jury has
applied the challenged instruction in a way that
prevents the consideration of constitutionally
relevant evidence.

Id., at 380.  The factor (k) instruction "did not, as
petitioner seems to suggest, limit the jury's consideration
to 'any other circumstance of the crime which extenuates the
gravity of the crime.'  The jury was directed to consider
any other circumstance that might excuse the crime, which
certainly includes a defendant's background and character."
Id., at 382.

In Saffle v. Parks, 494 U.S. 484 (1990), the Court
rejected the argument that federal constitutional law
required that a capital jury be permitted to consider
sympathy for the defendant in deciding sentence:

. . . Parks argues that the Eighth Amendment, as
interpreted in 1983, required, and still requires,
that jurors be allowed to base the sentencing
decision upon the sympathy they feel for the
defendant after hearing his mitigating evidence.
We disagree and conclude that adoption of this
principle would create a new rule as defined in

79

1    <u>Teague</u> and <u>Penry</u>.

2

3  <u>Id</u>., at 489.  The Court explained:

4

5       We also reject Parks' contention that the

6       antisympathy instruction runs afoul of <u>Lockett</u> and

7       <u>Eddings</u> because jurors who react sympathetically to

8       mitigating evidence may interpret the instruction

9       as barring them from considering that evidence

10      altogether.  This argument misapprehends the

11      distinction between allowing a jury to consider

12      mitigating evidence and guiding their

13      consideration.

14

15  <u>Id</u>., at 492.  <u>Lockett</u> and <u>Eddings</u> addressed "what mitigating

16  evidence the jury must be permitted to consider," <u>id</u>. at

17  490, whereas <u>Parks</u> sought to instruct the jury "how it must

18  consider the mitigating evidence."  <u>Id</u>.  "There is a simple

19  and logical difference between rules that govern what

20  factors the jury must be permitted to consider in making its

21  sentencing decision, and rules that govern how the State may

22  guide the jury in considering and weighing those factors in

23  reaching a decision."  <u>Id</u>.  <u>See also</u> <u>Victor v. Nebraska</u>, 511

24  U.S. 1, 13 (1994) (Guilt phase instructions stating "you

25  must not be influenced by pity for a defendant or by

26  prejudice against him," and "[y]ou must not be swayed by

27  mere sentiment, conjecture, sympathy, passion, prejudice,

28  public opinion or public feeling" "correctly pointed the

1    jurors' attention to the facts of the case before them").

2

3         No principled distinction exists between the argument

4    the Court rejected in <u>Saffle v. Parks</u> and those petitioner

5    is making here.  Here, as in <u>Saffle</u>, the court instructed,

6    and the prosecutor argued, that the jury should not allow

7    itself to be swayed by sympathy for petitioner.  They did

8    not tell the jury it could not consider mitigating evidence.

9    Rather, they advised how it was supposed to consider the

10   mitigating evidence presented.  As in <u>Saffle</u>, prohibiting

11   jury instructions and prosecutorial arguments of this nature

12   would require creation of a new rule.  <u>See</u> <u>Davis v. Maynard</u>,

13   911 F.2d 415, 417 (10th Cir. 1990).  The California Supreme

14   Court's rejection of the state court analogues to

15   petitioner's claims B2(a) and B3(a) was not contrary to or

16   an unreasonable application of federal law.  <u>See</u> <u>Mayfield v.</u>

17   <u>Woodford</u>, 270 F.3d 915, 923 (9th Cir. 2001) (en banc) ("[N]o

18   reasonable jurist could debate or find wrong the district

19   court's denial of Mayfield's request for habeas corpus

20   relief on" similar claims); <u>Williams v. Schomig</u>, 2008 WL

21   763233, at *8-*9 (D. Nev. Mar. 19, 2008) (citing and

22   summarizing the relevant law in rejecting a challenge to a

23   "no sympathy" jury instruction under AEDPA).

24

25        In any event, at trial, petitioner's counsel did not

26   follow a strategy to elicit sympathy for petitioner.

27   Instead, counsel focused on his contentions that William

28   Acker's account of the murder was not credible and that

81

1  petitioner did not intend to kill a police officer, but
2  thought he was being attacked by a rival gang when he shot
3  the officer.  (21 R.T. 4703-31).  Given counsel's lack of
4  reliance on sympathy, any prosecutorial misconduct or trial
5  court error in stating that the jury may not consider
6  sympathy for petitioner as mitigating was plainly harmless.

7

8      Claims B(2)(a) and B(3)(a) are without merit.

9

10  G.   Claim B(2)(b)

11

12      In claim B(2)(b), petitioner claims the prosecutor
13  committed misconduct when he argued, in his penalty phase
14  closing argument, that the jury could consider only extreme
15  emotional disturbance as a mitigating factor.  (Crctd. Pet.,
16  at 10-11; Crctd. Ps&As., at 73).

17

18      The prosecutor argued:

19

20      Extreme emotional disturbance.  The judge talked
21      about that.  Well, there wasn't evidence of extreme
22      emotional disturbance on the part of the defendant.
23      Our position is that that would be, with the lack
24      of that, is an aggravating factor.  You can accept
25      that or reject it.
26        *     *     *
27      Extreme duress.  There was no evidence of extreme
28      duress.  No one was forcing the defendant to kill

1    Deputy Jack Williams.  It wasn't a situation where

2    somebody had somebody kidnapped and, 'If you don't

3    cooperate, we are going to kill a neighbor of

4    yours, a relative of yours, or somebody close to

5    you.

6    Mental disease or intoxication.  . . .  [¶]  We're

7    talking about if a person, is there something

8    mentally wrong with a person or the person was so

9    intoxicated with whatever, alcohol or whatever,

10   that he somehow was beside himself, he wasn't a

11   normal person.  [¶]  There was absolutely,

12   absolutely no evidence presented as to the

13   defendant being intoxicated or that there was any

14   mental disease or disturbance on his part.

15   Granted, this is not a really brilliant plan, but

16   we are not talking about brilliance on the part of

17   the defendant.  We're talking, was there any mental

18   disease?  There was not.

19

20   (21 R.T. 4676-77).

21

22   The United States Supreme Court has repeatedly held

23   that, in a capital sentencing proceeding, "a sentencer may

24   not be precluded from considering, and may not refuse to

25   consider, any relevant mitigating evidence offered by the

26   defendant as the basis for a sentence less than death."

27   Penry v. Lynaugh, 492 U.S. 302, 318 (1989); see also Skipper

28   v. South Carolina, 476 U.S. 1, 4 (1986); Eddings v.

1   Oklahoma, 455 U.S. 104, 110 (1982); Lockett v. Ohio, 438

2   U.S. 586, 604 (1978).  The sentencer must be able to "give

3   effect to all relevant mitigating evidence offered" by a

4   capital defendant.  Boyde v. California, 494 U.S. 370,

5   377-78 (1990).  The United States Supreme Court has refused

6   to tolerate "[a]ny barrier" to the proper use of mitigating

7   evidence: "Whatever the cause, the conclusion would

8   necessarily be the same: Because the sentencer's failure to

9   consider all of the mitigating evidence risks erroneous

10  imposition of the death sentence, in plain violation of

11  Lockett, it is our duty to remand . . . for resentencing."

12  McKoy v. North Carolina, 494 U.S. 433, 442 (1990)

13  (citations, internal quotes, and alterations omitted).

14

15      The United States Supreme Court has recently reaffirmed

16  the breadth of the range of evidence that the capital

17  sentencer must be instructed to consider:

18

19          'Relevant mitigating evidence is evidence which

20          tends logically to prove or disprove some fact or

21          circumstance which a fact-finder could reasonably

22          deem to have mitigating value.'  Thus, a State

23          cannot bar 'the consideration of . . . evidence if

24          the sentencer could reasonably find that it

25          warrants a sentence less than death.'

26

27  Tennard v. Dretke, 542 U.S. 274, 284-85 (2004) (quoting

28  McKoy, 494 U.S. at 440) (further citations, internal quotes,

and alterations omitted).  Applying this "low threshold for
relevance," id., the Court has rejected the view that
mitigating evidence is only relevant if it demonstrates that
the defendant had "a uniquely severe permanent handicap"
that bore a "nexus" to the crime.  Id. at 284, 289.  The
Court has characterized the "nexus" requirement as "a test
we never countenanced and now have unequivocally rejected."
Smith v. Texas, 543 U.S. 37, 45 (2004).

One of the statutory sentencing factors the jury was to
consider here in deciding whether to sentence petitioner to
death was "[w]hether or not the offense was committed while
the defendant was under the influence of extreme mental or
emotional disturbance."  Cal. Pen. Code § 190.3(d).  (2 C.T.
380).  Viewed in isolation, the prosecutor's argument could
be seen as an invitation to the jury to ignore mitigating
evidence of mental or emotional disturbance which was not
extreme, in violation of the Court's mandate to give effect
to all mitigating evidence.  However, the trial court
instructed the jury in accordance with "factor (k)," which
calls for it to consider "[a]ny other circumstance which
extenuates the gravity of the crime even though it is not a
legal excuse for the crime."  Cal. Pen. Code § 190.3(k).  (2
C.T. 381).  Under this instruction, the jury was free to
consider mitigating evidence of mental or emotional
disturbance which was not extreme.  Defense counsel's
closing argument focused on the facts and circumstances of
the crime, and counsel made no claim that petitioner

1  suffered from mental or emotional disturbance or illness.

2  (See, e.g., 21 R.T. 4703).  The fact that the prosecutor's

3  argument focused on one set statutory factors did not

4  preclude the jury from considering the mitigating evidence

5  presented.  See Turner v. Calderon, 970 F. Supp. 781, 801

6  (E.D. Cal. 1997) (rejecting challenge to jury instructions

7  similar to the argument made here), aff'd., 281 F.3d 851

8  (9th Cir. 2002).

9

10  Claim B(2)(b) is without merit.

11

12  H.  Claim B(2)(c)

13

14  In claim B(2)(c), petitioner argues that the prosecutor

15  committed misconduct by misstating the law concerning the

16  penalty phase jury's discretion in deciding sentence.

17  (Crctd. Pet., at 10-11; Crctd. Ps&As., at 74-78).

18

19  1.  Background

20

21  Prior to penalty phase closing argument, the trial

22  judge gave then CALJIC 8.84.1, which stated in part:

23

24  In determining which penalty [death or life without

25  parole] is to be imposed on the defendant, you shall

26  consider all of the evidence which has been received

27  during any part of the trial of this case . . . .  You

28  shall consider, take into account and be guided by the

1     following factors, if applicable . . . ."

2

3    (2 C.T. 380).  The trial judge then read the aggravating and

4    mitigating factors listed in Cal. Pen. Code § 190.3(a)-(k).

5    (2 C.T. 380-81).  Later, the trial judge gave a modified

6    version of CALJIC 8.84.2, which stated in part:

7

8         It is now your duty to determine which of the two

9         penalties, death or confinement in the state prison

10        for life without possibility of parole, shall be

11        imposed on the defendant.

12        After having heard all of the evidence, and after

13        having heard and considered the arguments of

14        counsel, you shall consider, take into account and

15        be guided by the applicable factors of aggravating

16        and mitigating circumstances upon which you have

17        been instructed.

18        If you conclude that the aggravating circumstances

19        outweigh the mitigating circumstances, you shall

20        impose a sentence of death.  However, if you

21        determine that the mitigating circumstances

22        outweigh the aggravating circumstances, you shall

23        impose a sentence of confinement in the state

24        prison for life without the possibility of parole.

25

26   (2 C.T. 396-97).

27

28        In People v. Brown, 40 Cal.3d. 512 (1985), rev'd. on

87

other grounds sub nom. California v. Brown, 479 U.S. 538
(1987), the California Supreme Court described the federal
constitutional requirements applicable to the jury's capital
sentencing responsibilities:

> [W]ith respect to the process of selecting from
> among that class those defendants who will actually
> be sentenced to death, '[w]hat is important . . .
> is an individualized determination on the basis of
> the character of the individual and the
> circumstances of the crime.'  It is not simply a
> finding of facts which resolves the penalty
> decision, '"but . . . the jury's moral assessment
> of those facts as they reflect on whether defendant
> should be put to death"'  The jury must be free to
> reject death if it decides on the basis of any
> constitutionally relevant evidence or observation
> that it is not the appropriate penalty. . . .
> We agree with defendant, therefore, that a statute
> would be invalid if interpreted to preclude juror
> consideration of any factors constitutionally
> relevant to imposition of the death penalty.  Nor
> would a statute pass muster if it required jurors
> to render a death verdict on the basis of some
> arithmetical formula, or if it forced them to
> impose death on any basis other than their own
> judgment that such a verdict was appropriate under
> all the facts and circumstances of the individual

1          case.  We agree with the People, however, that the
2          1978 death penalty law need not, and should not, be
3          so interpreted.

4

5    Id., at 540.  The California Supreme Court then stated that
6    the 1978 law, though it changed the prior law to require the
7    jury to "weigh," rather than to "consider, take into account
8    and be guided by," the listed factors, "does not rob the
9    jury of its constitutional responsibility to decide what
10   penalty is appropriate under all the relevant
11   circumstances."[32]   Id., at 544.

12

13        In penalty phase closing argument in petitioner's state
14   court trial, the prosecutor said:

15

16        I - I built a little scale.  That's something I had
17        in my garage.  It's not very professional, as you
18        can see, but the idea is to give you a concept, I'm
19        giving you an idea.  [¶]  I'm sure Mr. Bencangey
20        will have some comments about my amateur job here.
21        But you have two things, and I am trying to get
22        across two points.  [¶]  You've got the first job,
23        to take the evidence and decide which side does it
24        go on?  Is it aggravating or is it mitigating?
25        After you decide that, then you have the next job,

26

27   [32]   California trial courts have since incorporated the
28   holding of Brown in the concluding penalty phase jury
     instruction.   See CALJIC 8.88 (6th ed. 1996).

1      to decide how much weight am I going to give to it?

2      Now, that one, I think – listen to the defense on

3      that, because I would anticipate that they are

4      going to say that this is – this isn't fair, this

5      isn't a fair representation, because I'm

6      overweighting it.

7      I don't mean to do that.  I'm trying to take a

8      synopsis of each one of those factors His Honor

9      read.  I think there were twelve factors.  So I put

10      them there.  They weren't weighted properly.

11      That is your job.  You have got to give the weight

12      to them.  A little weight, a lot of weight.  That's

13      your decision.   So schematically I couldn't do it

14      without giving it equal weight.

15

16  (21 R.T. 4674).  The prosecutor later stated:

17

18      When all these [factors] are added up, and His

19      Honor has already read to you, you weigh them.  If

20      the aggravating factors outweigh the mitigating

21      factors, the sentence is death.  <u>There's no –</u>

22      <u>there's no alternative for you.  If they outweigh,</u>

23      <u>it is automatically death.</u>

24      On the other hand, if mitigation outweighs

25      aggravation, it is automatically life imprisonment

26      without possibility of parole. [¶] So there is no

27      option, once you do your calculations.

28

1    (21 R.T. 4678 (emphasis added); <u>see</u> <u>also</u> 21 R.T. 4688 ("The
2    law says if the aggravating factors, those are the factors,
3    outweigh the mitigating, the sentence is death.")).

4

5         In his rebuttal, the prosecutor stated:
6         You didn't hear his Honor saying anything about
7         when it is appropriate.  His Honor said your job is
8         a weighing process.  It's not for you to think this
9         an appropriate - type case: no, this is not an
10        appropriate - type case.'  That is not for you to
11        decide. Not really.

12

13   (21 R.T. 4747).  After classifying various factors as
14   aggravating or mitigating, the prosecutor then turned to the
15   weight to be assigned to each factor:

16

17        Mr. Bencangey does not like my scales, so let me
18        try again.
19        Okay.  I will try one more time.  I'm trying to get
20        across an idea.  I don't care what you call it.
21        Afterwards, when I did this, I realized that I
22        guess those of you who are in accounting, and some
23        of you are, I guess it wouldn't be called a balance
24        sheet.  Maybe it's really called a financial
25        statement, but my accounting background isn't too
26        good.
27        But, anyway, let me give you the thrust of it.
28        You have got one column for aggravation; you have

1    got another column for mitigation and let's say you
2    - you are doing your job as a juror.  You are
3    trying to decide where they fit and how much weight
4    to give to them.
5    As Mr. Bencangey says, 'Well, this overweights it
6    on the scales.  This isn't fair.'
7    Let's do it this way. . . .  Let's say you can give
8    a number of 1 to 10, 1 to 10 for each one of those.
9    1 to 10.
10   How about the killing?  The nature of the crime?
11   What are we going to consider that?
12   I mean, that was cold. That was planned.
13   You know, Mr. Bencangey can say it was not
14   aggravating, but that was aggravating.
15   On a scale of 1 to 10, that would be, let's say, a
16   No. 9.
17   Couldn't get much more aggravating than that, the
18   manner in which it was done.
19   Next, prior violence.
20   As I have indicated, a conviction for great bodily
21   injury . . .
22      *   *   *
23   I mean, that does show that a person is a violent
24   person and has had violent criminal activity.  Now,
25   on a scale of 1 to 10, maybe that would be a 5.
26   . . . Okay.  Now, we have no evidence of mental
27   disturbance.
28   Let's give that a 1.  No victim participation.

92

1    Give it a 1.

2    No moral justification.

3    Now, Mr. Bencangey wants to argue that one and say,

4    'Well, there might be some extenuating

5    circumstances,' but until he gives you some hard

6    evidence of that, let's give that a 1.

7    There is no distress.  Give that a 1.

8    There is no evidence of intoxication.  Give that a

9    1.

10   The defendant is not of tender age, certainly

11   doesn't fit on mitigation, it fits on aggravation.

12   Give it a 1.

13   All of these are the benefit of the doubt.  I'm

14   giving them the lowest possible.

15   The defendant was a principal in this. He was not

16   the accessory.

17   Let's give that a 1.

18   Now, this one [apparently referring to factor (k)],

19   we are still waiting on and maybe Mr. Bencangey can

20   change all of this by indicating that that should

21   be on this side, but there was no extenuating

22   circumstances.  We will give that a 1.

23   And then we have, yeah, on the mitigation side, we

24   have got prior felony.  There is no prior felony.

25   Let's say give that a 3.

26   Okay, now, Mr. Bencangey is going to say afterward,

27   'Wait just a minute. How did Mr. Bowers [the

28   prosecutor] arrive at these?'

1     I'm giving you an example.  I'm not telling you
2     that these are numerical, that this is the way
3     you're going to do it.
4     I'm just trying to get across concepts and the only
5     way I know how to do it is to give illustrations.
6     Your numbers may be entirely different.  You may
7     approach it differently, but you have got to think
8     of it in a logical, and I know that you will think
9     of it in a logical manner, of what is aggravating
10    and what is mitigating.
11    When you total it up -
12    *   *   *
13    22 versus 3.
14    You change the numbers however you want to change
15    them and you figure out how you can get it to come
16    out so that the mitigation is greater than the
17    aggravation.  You will not.  You will not.
18    I submit to you, you will not.
19
20    (21 R.T. 4764-67).
21
22    The California Supreme Court applied <u>Brown</u> in
23    petitioner's case and rejected petitioner's arguments on
24    direct appeal that, by using a scale and assigning
25    arithmetic values to each factor, the prosecutor suggested
26    the weighing process was mechanical, and that the
27    prosecutor's argument the penalty process was automatic and
28    that the jury was not to decide if death was appropriate

1    misled the jury.  <u>People v. Gonzalez</u>, 51 Cal. 3d at 1227-31.

2

3         2.   <u>Discussion</u>

4

5         In <u>Jurek v. Texas</u>, 428 U.S. 262 (1976), the United

6    States Supreme Court upheld a statute requiring the

7    imposition of a death sentence if the jury made certain

8    findings against the defendant beyond a first degree murder

9    conviction.  <u>See</u> <u>id</u>., at 278 (White, J., concurring in

10   judgment).  A majority of the Court believed the Texas

11   sentencing scheme at issue in <u>Jurek</u> cured the constitutional

12   defect identified in <u>Furman</u>--that juries were imposing the

13   death penalty inconsistently and randomly.  <u>See</u> <u>Furman</u>,

14   <u>supra</u>, 408 U.S. at 309-310 (Stewart, J., concurring).  By

15   limiting a sentencing jury's discretion "so as to minimize

16   the risk of wholly arbitrary and capricious action," <u>Gregg</u>

17   <u>v. Georgia</u>, 428 U.S. 153, 189 (1976) (opinion of Stewart,

18   Powell, and Stevens, JJ.), the Texas scheme passed

19   constitutional muster.  <u>See</u> <u>Jurek</u>, 428 U.S. at 276.

20

21        The <u>Jurek</u> plurality thought it significant that the

22   Texas sentencing scheme allowed the jury to consider

23   relevant mitigating evidence.  "A jury must be allowed to

24   consider on the basis of all relevant evidence not only why

25   a death sentence should be imposed, but also why it should

26   not be imposed." <u>Id</u>., at 271 (opinion of Stewart, Powell,

27   and Stevens, JJ.).  The same day the Court decided <u>Jurek</u>, it

28   struck down two capital sentencing schemes because they

automatically imposed a death sentence on a defendant
convicted of certain murders, without allowing
"particularized consideration of relevant aspects of the
character and record of each convicted defendant before the
imposition upon him of a sentence of death."  Woodson v.
North Carolina, 428 U.S. 280, 303 (1976) (plurality
opinion); Roberts v. Louisiana, 428 U.S. 325, 333-334 (1976)
(plurality opinion); see also Lockett v. Ohio, 438 U.S. 586,
604 (1978) (plurality opinion) ("The mandatory death penalty
statute in Woodson was held invalid because it permitted no
consideration of relevant facets of the character and record
of the individual offender or the circumstances of the
particular offense") (quotation omitted).

In Lockett, the Court explained that a sentencer must
be allowed to consider, "as a mitigating factor, any aspect
of a defendant's character or record and any of the
circumstances of the offense that the defendant proffers as
a basis for a sentence less than death."  438 U.S. at 604
(footnote omitted).  In Penry v. Lynaugh, 492 U.S. 302
(1989), the Court held that "the jury must be able to
consider and give effect to any mitigating evidence relevant
to a defendant's background and character or the
circumstances of the crime."  Id., at 328.

In Blystone v. Pennsylvania, 494 U.S. 299 (1990), the
Court addressed a Pennsylvania sentencing provision which
provided that "[t]he verdict must be a sentence of death if

the jury unanimously finds at least one aggravating
circumstance . . . and no mitigating circumstance or if the
jury unanimously finds one or more aggravating circumstances
which outweigh any mitigating circumstances."  Id., at 302
(internal quotes and cite omitted)).   The Court stated:

> We think that the Pennsylvania death penalty
> statute satisfies the requirement that a capital
> sentencing jury be allowed to consider and give
> effect to all relevant mitigating evidence.
> Section 9711 does not limit the types of mitigating
> evidence which may be considered, and subsection
> (e) provides a jury with a nonexclusive list of
> mitigating factors which may be taken into
> account--including a 'catchall' category providing
> for the consideration of '[a]ny other evidence of
> mitigation concerning the character and record of
> the defendant and the circumstances of his
> offense.'  Nor is the statute impermissibly
> 'mandatory' as that term was understood in Woodson
> or Roberts.  Death is not automatically imposed
> upon conviction for certain types of murder.  It is
> imposed only after a determination that the
> aggravating circumstances outweigh the mitigating
> circumstances present in the particular crime
> committed by the particular defendant, or that
> there are no such mitigating circumstances.

1  Id., at 305 (internal citations omitted).

2

3      Based on Blystone, the Court in Boyde v. California

4  rejected a claim that the "shall impose" language of CALJIC

5  8.84.2 unconstitutionally interfered with the jury's

6  sentencing discretion:

7

8          Although Blystone, unlike Boyde, did not present

9          any mitigating evidence at the penalty phase of his

10         capital trial, the legal principle we expounded in

11         Blystone clearly requires rejection of Boyde's

12         claim as well, because the mandatory language of

13         CALJIC 8.84.2 is not alleged to have interfered

14         with the consideration of mitigating evidence.

15         Petitioner suggests that the jury must have freedom

16         to decline to impose the death penalty even if the

17         jury decides that the aggravating circumstances

18         'outweigh' the mitigating circumstances.  But there

19         is no such constitutional requirement of unfettered

20         sentencing discretion in the jury, and States are

21         free to structure and shape consideration of

22         mitigating evidence 'in an effort to achieve a more

23         rational and equitable administration of the death

24         penalty.'

25

26  Boyde, 494 U.S. at 377 (internal cite omitted).  See also

27  Bonin v. Calderon, 59 F.3d 815, 849 (9th Cir. 1995)

28  (rejecting the same argument in light of Boyde), cert.

1  <u>denied</u>, 516 U.S. 1051 (1996).

2

3      In <u>Turner v. Calderon</u>, 281 F.3d 851 (9th Cir. 2002),

4  the Ninth Circuit confronted a prosecutor's argument very

5  similar to what the prosecutor said here.  In <u>Turner</u>, the

6  prosecutor stated: "And in one of your instructions there,

7  it's listed, those factor[s] are listed one by one.  You're

8  to weigh them, and if one, if the aggravating outweighs the

9  mitigating, then the decision's obvious. Otherwise it's

10  obvious the other direction[]." <u>Id</u>., at 868.  The Ninth

11  Circuit ruled this argument did not make the jury's choice

12  of a death sentence a "foregone conclusion" because, in jury

13  instructions and other arguments, the trial court, the

14  prosecutor, and defense counsel all properly informed the

15  jury of its duties.  <u>Id</u>., at 868-69.  The defense also

16  "emphasized the importance of conducting the weighing

17  process and the seriousness of the impending life or death

18  decision," when it asked the jury if "the evidence [is] so

19  clear in this case of aggravating factors that the

20  aggravating factors outweigh the mitigating factors that

21  we--I'm part of this procedure as much as you--that we

22  should presume the power of ending another person's life."

23  <u>Id</u>.  Finally, the trial court's jury instructions

24  "clarif[ied] the jury's role one last time after the closing

25  arguments."[33]   <u>Id</u>.  The Ninth Circuit concluded that "the

26  _____

27  [33]   The trial court instructed the jury that:

28       If you conclude that the aggravating circumstances
      outweigh the mitigating circumstances, you shall

1   jury was informed of its responsibility to weigh the

2   aggravating and mitigating circumstances, of its duty to

3   determine the weight each factor received, and of the

4   difficulty of making the determination."   Id.

5

6       In light of these cases, the mandatory language of the

7   "weighing" instruction and argument does not constitute

8   error warranting the issuance of the writ.   See Turner, 281

9   F.3d at 886-887.   To the extent California law gives the

10  jury more discretion than the statutory language, jury

11  instructions and counsel's argument suggest, this is a state

12  law issue and does not raise a federal claim unless the

13  state has arbitrarily denied a state created right.[34]

14  Estelle v. McGuire, 502 U.S. 62(1991); Hicks v. Oklahoma,

15  447 U.S. 343, 346 (1980) ("arbitrary disregard of the

16  _____

17          impose a sentence of death. [¶]   However, if you
        determine that the mitigating circumstances

18      outweigh the aggravating circumstances, you shall
        impose a sentence of confinement in the state

19      prison for life without possibility of parole.

20  281 F.3d at 869.

21  [34]   In Hicks, the Court held:

22      Where . . . a State has provided for the imposition
        of criminal punishment in the discretion of the

23      trial jury, it is not correct to say that the
        defendant's interest in the exercise of that

24      discretion is merely a matter of state procedural
        law.   The defendant in such a case has a

25      substantial and legitimate expectation that he will
        be deprived of his liberty only to the extent

26      determined by the jury in the exercise of its
        statutory discretion, and that liberty interest is

27      one that the Fourteenth Amendment preserves against
        arbitrary deprivation by the State.

28  Hicks v. Oklahoma, 447 U.S. at 346.

1 petitioner's right to liberty is a denial of due process of

2 law"); Ross v. Oklahoma, 487 U.S. 81, 91 (1988).

3

4      In Murtishaw v. Woodford, 255 F.3d 926, 969-70 (9th

5 Cir. 2001), cert. denied, 535 U.S. 935 (2002), the

6 California Supreme Court had ruled that the trial court's

7 sentencing of a capital defendant under the 1978 death

8 penalty law, which requires that the jury "shall" impose

9 death if aggravating circumstances outweighed mitigating

10 circumstances, instead of the 1977 statute, which did not

11 contain the "shall" language, was error but that the error

12 was harmless because the jury would have understood that the

13 standard under both statutes was the same.  Applying Hicks

14 under a pre-AEDPA review standard, the Ninth Circuit ruled

15 that the error violated due process:

16

17      In concluding that this conceded error was

18      harmless, the California court seemed to solely

19      rely on the attorneys' arguments at trial

20      discussing the weighing of factors as having

21      clarified any potential confusion.  Aside from the

22      attorneys' statements, none of which included any

23      clarification that the 'shall' in the 1978 statute

24      really meant 'may', the jury received only the

25      bare, seemingly mandatory language of the statute.

26      In light of the plain language of the statute, the

27      judicial presumption that jurors follow the

28      instructions of the court rather than the

attorneys, and the fact that neither attorney made

any clarification with regard to the plain and

apparent mandatory language, under <u>Hicks</u>, this

error . . . will deprive petitioner of his life by

the jury's potential confusion over the exercise of

its statutory discretion.  Such an arbitrary

deprivation of life violates due process.

255 F.3d at 970.

<u>Murtishaw</u> rests on the fact that the assessment of aggravating and mitigating factors under the 1977 death penalty statute was different from the weighing process under the 1978 law applicable here.[35]  By contrast, in the present case, the California Supreme Court found no error, determining that the trial court properly applied the rule

---

[35]   As the California Supreme Court explained in <u>Brown</u>:

The 1978 California initiative does, of course, represent a change from its 1977 predecessor; the 1978 law tells the jury to decide the appropriate punishment by weighing certain factors, while the 1977 version asked only that the sentencer 'consider, take into account and be guided by' the factors listed.  But this amendment does not rob the jury of its constitutional responsibility to decide what penalty is appropriate under all the relevant circumstances.  It simply makes clear that, in resolving the ultimate issue of punishment under the 1978 law, the jurors are to limit their consideration to 'the specific factors listed in the statute . . .'  Nothing in the amended language limits the jury's power to apply those factors as it chooses in deciding whether, under all the relevant circumstances, defendant deserves the punishment of death or life without parole.

<u>People v. Brown</u>, 40 Cal. 3d at 544.

of <u>People v. Brown</u>, <u>supra</u>, to petitioner's case.  The Court

found that there was no potential jury confusion, and that

petitioner received the jury sentencing discretion to which

the 1978 law, as <u>Brown</u> interpreted it, entitled him.  51

Cal. 3d at 1229-31.  Again, by contrast, here the prosecutor

and defense counsel explained the "shall" language in the

1978 law did not limit the jury's discretion in weighing the

aggravating and mitigating factors, as state law, under

<u>Brown</u>, requires.[36]


    The federal courts "may not second-guess the California

appellate court's construction of its own state law unless

'it appears that its interpretation is an obvious subterfuge

to evade consideration of a federal issue.'"  <u>Hubbart v.

Knapp</u>, 379 F.3d 773, 780 (9th Cir. 2004) (internal cites

omitted), <u>cert</u>. <u>denied</u>, 543 U.S. 1071 (2005).  There is "no

such subterfuge here," and "the state court's denial of

[petitioner's] habeas petition is not contrary to, or an

unreasonable application of, <u>Hicks v. Oklahoma</u>."  <u>Id</u>.

---

[36]   The prosecutor specifically stated at the beginning of
his closing argument that deciding how much weight to attach
to each factor was "your job.  You have got to give the
weight to them.  A little weight, a lot of weight.  That's
your decision."  (21 R.T. 4674).  It was only after the jury
did its discretionary calculations and weighed the factors
that, according to the prosecutor, the sentence would
"automatically" be death or life imprisonment without
parole.  (21 R.T. 4678-79).

    In his rebuttal presentation, defense counsel emphasized
that the jury should not engage in a mechanical weighing
process: "<u>I don't think that that's what we're talking
about, what we should be talking about</u>."  (21 R.T. 4771-72
(emphasis added)).

1     Claim B(2)(c) is without merit.

2

3   I.   Claim B(2)(d)

4

5     In claim B(2)(d), petitioner contends the prosecutor

6   committed misconduct by repeatedly arguing that lack of

7   evidence of a mitigating factor was aggravating (Crctd.

8   Pet., at 10-11; Crctd. Ps&As., at 71-74), i.e., Davenport

9   Error.  (Am. Pet., at 259-60).

10

11     The prosecutor argued at petitioner's second penalty

12   phase trial:

13

14       You've got the first job, to take the evidence and

15       decide which side does it go on? Is it aggravating

16       or is it mitigating?

17         *     *     *

18       Let's talk about the different factors.

19       The one, as far as mitigation, the People did not

20       present any evidence of a prior felony conviction

21       against the defendant.

22       That's a mitigating factor, the absence of a prior

23       felony conviction.  We didn't – we didn't sustain

24       our burden.  We didn't do our job.  So that is in

25       mitigation.

26         *     *     *

27       Extreme emotional disturbance.  The judge talked

28       about that.  Well, there wasn't evidence of extreme

emotional disturbance on the part of the defendant.

Our position is that that would be, with the lack

of that, is an aggravating factor.  You can accept

that or reject it.

    *    *    *

Anyway, the last two. Age.  That one fits in the

aggravating column.  The defendant is not of tender

years. . . .

(21 R.T. 4674-77).

    The California Supreme Court has ruled that certain

factors listed in Cal. Pen. Code § 190.3 can only mitigate.[37]

------

[37]    "The factors that can serve only as mitigators are:

"'(d) Whether or not the offense was committed while the
defendant was under the influence of extreme mental or
emotional disturbance.

"'(e) Whether or not the victim was a participant in the
defendant's homicidal act or consented to the homicidal act.

"'(f) Whether or not the offense was committed under
circumstances which the defendant reasonably believed to be
a moral justification or extenuation for his conduct.

"'(g) Whether or not the defendant acted under extreme
duress or under the substantial domination of another
person.

"'(h) Whether or not at the time of the offense the capacity
of the defendant to appreciate the criminality of his
conduct or to conform his conduct to the requirements of law
was impaired as a result of mental disease and defect, or
the [e]ffects of intoxication.

"'(I) The age of the defendant at the time of the crime.

"'(j) Whether or not the defendant was an accomplice to the
offense and his participation in the commission of the
offense was relatively minor.'"

1   <u>Tuilaepa v. California</u>, 512 U.S. 967, 990 (1994) (Blackmun,

2   J., dissenting); <u>Allen v. Woodford</u>, 395 F.3d 979, 1017 (9th

3   Cir. 2005), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>. <u>Allen v. Brown</u>, 546 U.S.

4   858 (2005).  As the California Supreme Court noted in

5   petitioner's direct appeal, under California law, "[t]he

6   mere absence of extenuating circumstances in the case cannot

7   weigh in favor of death."  <u>People v. Gonzalez</u>, 51 Cal. 3d at

8   1234.  In <u>People v. Davenport</u>, 41 Cal. 3d 247 (1985), the

9   California Supreme Court, in construing the 1978 death

10  penalty law, ruled that a prosecutor's argument that, under

11  Cal. Pen. Code § 190.3, the absence of mitigation was an

12  aggravating factor was improper.  The court stated:

13

14       '[A]ggravation' is by definition a circumstance

15       above and beyond the essential constituents of a

16       crime which increases its guilt or enormity or adds

17       to its injurious consequences.  Mitigating

18       circumstances, on the other hand, are ones which

19       although not constituting an excuse for or

20       justification of the crime, may be considered as

21       extenuating or reducing the degree of moral

22       culpability.  Thus, the absence of mitigation would

23       not automatically render the crime more offensive

24       than any other murder of the same general

25       character.  [¶]  Several of the statutory

26       mitigating factors are particularly unlikely to be

27  _____

28  <u>Tuilaepa</u>, 512 U.S. at 990 n.19 (Blackmun, J., dissenting)
    (<u>quoting</u> Cal. Pen. Code § 190.3).

present in a given case.  To permit consideration
of the absence of these factors as aggravating
circumstances would make these aggravating
circumstances automatically applicable to most
murders.  [¶]  We conclude that the form of the
prosecutor's argument is likely to confuse the jury
as to the meaning of 'aggravation' and 'mitigation'
under the statute and is therefore improper under
section 190.3.

Id., at 289-90 (citations omitted).  Thus, "[t]he prosecutor
properly could have argued that there was no evidence of
mental impairment or intoxication and the jury could
consider this lack of evidence," but "[t]he prosecutor could
not argue . . . that under California law this lack of
evidence constituted a positive aggravating factor."
McDowell v. Calderon, 107 F.3d 1351, 1364-65 (9th Cir.)
(citations omitted), amended on other grounds, 116 F.3d 364
(9th Cir.), vacated on other grounds, 130 F.3d 833 (9th Cir.
1997) (en banc), cert. denied, 523 U.S. 1103 (1998).

    The prosecutor's comments in petitioner's case
constitute clear Davenport error.  However, the California
Supreme Court found the error harmless.  After noting that
petitioner's counsel failed to object, the court found:

    In any event, a reasonable jury would not have been
    misled, and there is no reasonable possibility the

1       penalty verdict was affected.  The jury was
2       instructed to consider each sentencing factor only
3       'if applicable,' and was not misled about the basic
4       nature of its sentencing task.  In his argument,
5       the prosecutor assigned the bulk of his proposed
6       aggravating values to the brutal circumstances of
7       the shooting, and only nominal weights to the
8       absent extenuating factors.  He cautioned
9       frequently that his characterizations of
10      aggravation and mitigation, and of relative
11      weights, were mere advocacy which the jurors were
12      free to reject.  Defense counsel strongly urged the
13      jury to decide penalty by evaluating the overall
14      circumstances.  Given such freedom, a reasonable
15      jury would not assign substantial aggravating
16      weight to the absence of unusual extenuating
17      factors.  [Petitioner] fails to persuade us that
18      the prosecutor's misstatements justify reversal.
19
20   People v. Gonzalez, 51 Cal. 3d at 1234 (citations omitted).
21
22        It is not clearly established if Davenport error is
23   only state law error or of federal constitutional dimension.
24   The federal constitution imposes no freestanding requirement
25   that California's death-penalty scheme define which factors
26   listed in Cal. Pen. Code § 190.3 are aggravating or
27   mitigating.  Tuilaepa v. California, 512 U.S. at 978-79 ("A
28   capital sentencer need not be instructed how to weigh any

particular fact in the capital sentencing decision."); id.,
512 U.S. at 983-84 (Stevens, J., concurring) ("[R]efusing to
characterize ambiguous evidence as mitigating or aggravating
is . . . constitutionally permissible"); Zant v. Stephens,
supra, 462 U.S. at 875 (upholding a scheme granting the jury
"unbridled discretion" to decide whether to impose the death
penalty after finding defendant death eligible).  Although
the California Supreme Court has so-defined the statutory
factors in Davenport, neither the United States Supreme
Court nor the Ninth Circuit has ever definitively held that
Davenport error is federal constitutional error.[38]  Compare
McDowell, supra, 107 F.2d at 1365 n.7 (assuming but not
deciding "that it could be an error of federal
constitutional dimension" for the prosecutor to argue that
absence of a mitigating factor is aggravating) with Allen,
supra, 395 F.3d at 1017-18 and Turner v. Calderon, supra,
281 F.3d at 869-70 (assuming Davenport error is of
constitutional magnitude but finding the error harmless).
Given this state of the law, it cannot be said that the
California Supreme Court's refusal to grant relief on
petitioner's claim of Davenport error is contrary to or an
un reasonable application of clearly established federal law
as determined by the United States Supreme Court.

---

[38]   In Tuilaepa, Justice Blackmun noted in dissent that "a
process creating the risk that the absence of mitigation
will count as aggravation artificially inflates the number
of aggravating factors the jury weighs, 'creat[ing] the
possibility not only of randomness but also of bias in favor
of ... death.'"  512 U.S. at 991 (quoting Stringer v. Black,
503 U.S. 222, 236 (1992)).  However, the Court has never
held that Davenport error violates the federal constitution.

1    Further, the error was harmless.  Here, the prosecutor

2 relied primarily on the facts of the crime to justify the

3 death penalty, and the prosecutor's arguments treating the

4 absence of aggravating factors as mitigating were a small

5 part of his total closing argument.  There was no reasonable

6 possibility that the Davenport error affected the penalty

7 verdict.  Turner v. Calderon, 281 F.3d at 869-70 (finding

8 Davenport error harmless); Williams v. Vasquez, 817 F. Supp.

9 1443, 1488 (E.D. Cal. 1993) (same), aff'd. sub nom. Williams

10 v. Calderon, 52 F.3d 1465 (9th Cir. 1995), cert. denied, 516

11 U.S. 1124 (1996); Hamilton v. Ayers, 458 F. Supp. 2d 1075,

12 1150 (E.D. Cal. 2006) (same).

13

14    Claim B(2)(d) is without merit.

15

16 J.   Claim B(2)(e)

17

18    In his penalty phase closing argument, after arguing

19 that the jury should not believe defense witness Martin

20 Ybarra (21 R.T. 4740-46), the prosecutor stated:

21

22    You are the ones who are going to decide how much

23    weight you are going to give to Mr. Ybarra.  [¶]

24    The people submit not a great deal, but let's turn

25    it, let's look at the bright side of it for the

26    defense. [¶]  Let's say that Mr. Ybarra is telling

27    the truth.  [¶]  Where are you going to put this as

28    far as if he is the leader of Puente, the most

1          powerful person of a very, very violent gang where
2          there's shootings, stabbings, back and forth.  [¶]
3          Wouldn't you put that as an aggravating factor?
4          Wouldn't you make that as to the violent criminal
5          activity?  [¶] So it cuts both ways  [¶]  If you
6          want to believe him. then it becomes an extremely
7          aggravating factor.

9  (21 R.T. 4746).  Petitioner alleges in claim B(2)(e) that
10 "the prosecutor was guilty of prejudicial misconduct in his
11 argument to the jury that petitioner's affiliation with
12 gangs could be considered as an aggravating factor in its
13 determination of penalty."  (Crctd. Pet., at 10-12).

15         The California Supreme Court rejected the claim:
16         The prosecutor suggested that if credible, this
17         evidence '[cut] both ways,' since defendant's
18         leadership of a 'very, very violent' street gang
19         should be deemed aggravating. [¶] Defendant's
20         failure to object and request an admonition waived
21         any direct claim of misconduct.  Nor is reversal
22         warranted on any other theory.   We held in [People
23         v.] Boyd, []38 Cal.3d 762 [(1985)], that a
24         reputation for violence is not a statutory
25         sentencing factor, and thus may not be considered
26         as aggravating.  [cite]  Here, however, the
27         prosecutor ultimately discounted the credibility of
28         Ybarra's testimony, and he advised the jury to give

                              111

1    it no substantial weight.  Hence, his argument

2    could not have caused substantial harm.

3

4    People v. Gonzales, 51 Cal. 3d at 1232.

5

6        Under California law, evidence the prosecution offers

7    to support the Cal. Pen. Code § 190.3(b) violent criminal

8    activity aggravating circumstance must be of an actual

9    crime, and the prosecution must prove the commission of the

10   crime beyond a reasonable doubt.[39]  See People v. Phillips,

11   41 Cal. 3d 29, 64 (1985).  In addition, a prosecutor in a

12   capital case may not introduce non-statutory factors in

13   aggravation.  Sanders v. Woodford, 373 F.3d 1054, 1061 (9th

14   Cir. 2004) ("The California Supreme Court has expressly

15   interpreted § 109.3 as precluding the jury from considering

16   aggravating factors other than those statutorily defined."),

17   rev'd. on other grounds sub nom. Brown v. Sanders, 546 U.S.

18   212 (2006); People v. Boyd, 38 Cal. 3d 762, 775-76 (1985)

19   ("[T]he prosecution's case for aggravation is limited to

20   evidence relevant to the listed factors exclusive of factor

21   (k) - since that factor encompasses only extenuating

22   circumstances and circumstances offered as a basis for a

23   sentence less than death - while the defense may present

24   evidence relevant to any listed factor including (k);" but

25   _____

26   [39]   Cal. Pen. Code § 190.3(b), reads "The presence or
     absence of criminal activity by the defendant which involved
27   the use or attempted use of force or violence or the express
     or implied threat to use force or violence."  This provision
28   was read to the jury during the second penalty phase as Jury
     Instruction CALJIC 8.84.1.  (2 C.T. 380).

1    once the defense has presented mitigating evidence,

2    "prosecution rebuttal evidence is admissible to 'disprove

3    any disputed fact that is of consequence to the

4    determination of the action.'").

5

6        Under clearly established federal law, a prosecutor's

7    comments violate due process if they "inject irrelevant and

8    prejudicial evidence into the sentencing equation when there

9    is a significant likelihood that this evidence will

10   seriously infect the balancing process crafted by the state

11   statute." McLain v. Calderon, 1995 WL 769176, at *49 (C.D.

12   Cal. Aug. 22, 1995) (discussing erroneous admission of

13   evidence; citing Barclay v. Florida, 463 U.S. 939 (1983),

14   and Wainwright v. Goode, 464 U.S. 78 (1983)), aff'd., 134

15   F.3d 1383 (9th Cir.), cert. denied, 525 U.S. 942 (1998).

16

17       Noting that gang membership is not a crime, petitioner

18   argues the prosecutor did not present any proof that

19   petitioner committed any violent crime while affiliated with

20   a gang.  Instead, in contravention of state law, the

21   prosecutor simply told the jury petitioner was "the most

22   powerful person of a very, very violent gang where there's

23   shootings, stabbings, back and forth," and was engaged in

24   "violent criminal activity," which the jury could consider

25   as an "aggravating factor" at the penalty phase.  (21 R.T.

26   4746; see Ptr's. Opp. to Rsp's. Suppl. Br., at 37-38).

27

28       However, a central issue in petitioner's trial was gang

                                113

membership and activities.  Petitioner argued a rival gang
was trying to kill him because he was the leader of the
Puente Gang, that he thought the officers who entered his
house were gang members, and that he only killed Deputy
Williams because he thought he was being attacked by the
Bassett gang.  Petitioner based this contention in part on
the testimony of defense witness Ybarra that petitioner, as
a reputed leader of the Puente gang, was a high-priority
target of the Bassett gang.   The prosecutor's invitation to
the jury to treat this as an "aggravating factor," though
erroneous under state law, "could not have cause substantial
harm," People v. Gonzales, 51 Cal. 3d at 1232, because, as
the California Supreme Court noted, "the prosecutor
ultimately discounted the credibility of Ybarra's testimony,
and he advised the jury to give it no substantial weight,"
id., eliminating any "likelihood that this evidence will
seriously infect the balancing process crafted by the state
statute."[40]  McLain v. Calderon, 1995 WL 769176, at *49.
The California Supreme Court's holding is neither contrary
to, nor an unreasonable application of, United States

---

[40]   The prosecution's argument, that the jury should not
believe Ybarra, but if it did, then his testimony "becomes
an extremely aggravating factor" (21 R.T. 4746), could also
be treated as an inartfully articulated argument that the
jury should treat Ybarra's testimony as "prosecution
rebuttal evidence . . . admissible as evidence tending to
'disprove any disputed fact that is of consequence to the
determination of the action,'" Boyd, 38 Cal. 3d at 775-76,
in this case petitioner's claim that he was a peace-loving
individual who shot at the officers only because he thought
he was being attacked.  Because the defense did place much
emphasis on petitioner's alleged peaceful nature and the
California Supreme Court did not treat the prosecutor's
argument as rebuttal, the Court need not address the issue.

1   Supreme Court law.[41]

2

3        Claim B(2)(e) is without merit.

4

5   K.   Claim B(3)(b)

6

7        In claim B3(b), petitioner contends the trial judge

8   violated due process when he "erroneously instructed the

9   jury that only 'extreme emotional disturbance' could be

10  considered as a mitigating factor in its penalty

11  determination."  (Crctd. Pet., at 12).

12

13       Pursuant to Cal. Pen. Code § 190.3(d), the trial judge

14  instructed petitioner's second penalty phase jury that, in

15  deciding penalty, it was to consider "[w]hether or not the

16  offense was committed while the defendant was under the

17  influence of extreme mental or emotional disturbance."  (2

18  C.T. 380 (former CALJIC 8.84.1)).  The California Supreme

19  Court stated, however, that "the catch-all provision, factor

20  (k), by drawing the sentencer's attention to '[a]ny other

21  circumstance which extenuates the gravity of the crime,'

22  allows consideration of 'nonextreme' mental or emotional

23

24  [41]    Respondent asserts the "procedural bar" of the
    contemporaneous objection rule.  (Rsp's. Suppl. Br., at 35).
25  The Court need not address procedural bar.  Assuming the
    contemporaneous objection rule was not adequate to bar
26  federal review, or that petitioner has shown cause for his
    failure to object at trial, petitioner's failure to
27  establish entitlement to relief on the merits precludes a
    finding of prejudice.  Coleman v. Thompson, 501 U.S. 722,
28  749-50 (1991).

1 conditions." <u>People v. Gonzalez</u>, 51 Cal. 3d at 1227.  (2

2 C.T. 381 (former CALJIC 8.84.1)).  Relying on <u>Blystone v.</u>

3 <u>Pennsylvania</u>, <u>supra</u>, the Ninth Circuit has concurred:

4

5   In <u>Blystone</u>, petitioner argued that an instruction

6   that permitted the jury to consider '"extreme"

7   mental or emotional disturbance' impermissibly

8   precluded the jury's consideration of less degrees

9   of disturbance, impairment, or duress.  The Court

10   rejected the claim because the jury was not

11   prevented from considering relevant mitigating

12   evidence.  <u>Blystone</u> cannot be distinguished here.

13

14 <u>Dyer v. Calderon</u>, 122 F.3d 720, 741 (9th Cir. 1997)

15 (internal citations omitted), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 151

16 F.3d 970 (9th Cir. 1998) (en banc), <u>cert</u>. <u>denied</u>, 525 U.S.

17 1033 (1998).  In accordance with <u>Blystone</u>, as the Ninth

18 Circuit has interpreted it, the Court must conclude that

19 claim B(3)(b) is without merit.

20

21 L. <u>Claim B(3)(c)</u>

22

23   In claim B(3)(c), petitioner alleges the trial court

24 violated due process when it "erroneously admitted

25 irrelevant and inflammatory autopsy photographs of the

26 victim."  (Crctd. Pet., at 12).  In his memorandum of points

27 and authorities, petitioner does not discuss this claim.

28

During the penalty phase of the trial, the prosecution offered People's Exhibit 10, which the trial judge stated "depicts the chest area of the victim at the time that the victim was examined by the Coroner's Office and purports to be a coroner's photograph." (21 R.T. 4652). Petitioner's trial attorney objected that the photograph was inadmissible because "the prejudicial effect of this photograph outweighs the probative value." (21 R.T. 4652). After hearing from both sides, the trial judge ruled the photograph admissible (21 R.T. 4654-55). On direct appeal, the California Supreme Court found that allowing the photo into evidence violated Cal. Evid. Code § 352 but that the error was harmless because it "was not unduly grisly or inflammatory." People v. Gonzalez, 51 Cal 3d at 1236-37.

As an initial matter, petitioner did not present his federal due process claim in state court, and the state court claim he did present is not cognizable in this court. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1981) (federal habeas relief does not lie for alleged state law errors).

Furthermore, the federal claim is without merit. See 28 U.S.C. § 2254(b)(2). To violate Due Process, admission of evidence must have "so fatally infected the proceedings as to render them fundamentally unfair." Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991); see also Villafuerte v. Stewart, 111 F.3d 616, 627 (9th Cir. 1997), cert. denied, 522 U.S. 1079 (1998). "Only if there are no

1    permissible inferences the jury may draw from the evidence

2    can its admission violate due process[, and e]ven then, the

3    evidence must 'be of such quality as necessarily prevents a

4    fair trial.'"   Jammal, 926 F.2d at 920 (quoting

5    Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th

6    Cir.1986)).   Here, as the trial judge explained, the photo

7    helped explain "[t]he circumstances of the crime of which

8    the defendant was convicted in the present proceeding," Cal.

9    Pen. Code § 190.3(a), by showing how Officer Williams was

10   shot and his injuries.  (21 R.T. 4654).   Allowing the

11   photograph into evidence did not violate due process.

12

13       Claim B(3)(c) is without merit.

14

15   M.   Cumulative Error

16

17       The Ninth Circuit recognizes the cumulative error

18   doctrine in habeas cases.   Alcala v. Woodford, 334 F.3d 862,

19   893 (9th Cir. 2003) ("Even if no single error were

20   sufficiently prejudicial, where there are several

21   substantial errors, their cumulative effect may nevertheless

22   be so prejudicial as to require reversal.") (citations,

23   internal quotations and brackets omitted); Harris v. Wood,

24   64 F.3d 1432, 1438 9th Cir. 1995) ("prejudice may result

25   from the cumulative impact of multiple deficiencies")

26   (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir.

27   1978) (en banc)); see also Benn v Lambert, 283 F.3d 1040,

28   1058 (9th Cir. 2002) (As with Brady claims, the court

1   determines ineffective assistance of counsel prejudice based
2   on the totality of the evidence and the entire record);
3   <u>McNulty v. Olim</u>, 488 F. Supp. 1384 (D. Hawaii 1980) (where
4   petitioner asserts multiple errors by defense counsel, the
5   court must examine counsel's entire performance).  Whether
6   viewed individually or cumulatively, the errors in this case
7   do not require reversal.

8
9                              **ORDER**
10
11        For all of the reasons set forth above, the remaining
12   claims of the operative Corrected Petition for Writ of
13   Habeas Corpus are DENIED on the merits, and the action is
14   DISMISSED with prejudice.

15
16        IT IS SO ORDERED.
17
18
19   Dated: September 29, 2008.
20
21                          _____
22                              James V.  Selna
                           United States District Judge
23
24
25
26
27
28

                                119